## DURHAM v. UNITED STATES.
### No. 11859.

United States Court of Appeals
District of Columbia Circuit.

Argued March 19, 1954.

Decided July 1, 1954.

Petition for Rehearing In Banc
Denied Sept. 10, 1954.

Mr. Abe Fortas, Washington, D. C., appointed by this Court, with whom Mr. Abe Krash, Washington, D. C., was on the brief, for appellant.

Mr. Gerard J. O'Brien, Jr., Asst. U. S. Atty., Washington, D. C., with whom Messrs. Leo A. Rover, U. S. Atty., and Lewis A. Carroll and Arthur J. McLaughlin, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee. Mr. William J. Peck, Asst. U. S. Atty. at time record was filed, Washington, D. C., entered an appearance for appellee.

Before EDGERTON, BAZELON and WASHINGTON, Circuit Judges.

BAZELON, Circuit Judge.

Monte Durham was convicted of housebreaking,[1] by the District Court sitting without a jury. The only defense asserted at the trial was that Durham was of unsound mind at the time of the offense. We are now urged to reverse the conviction (1) because the trial court did not correctly apply existing rules governing the burden of proof on the defense of insanity, and (2) because existing tests of criminal responsibility are obsolete and should be superseded.[2]

I.

Durham has a long history of imprisonment and hospitalization. In 1945, at the age of 17, he was discharged from the Navy after a psychiatric examination had shown that he suffered "from a profound personality disorder which renders him unfit for Naval service." In 1947 he pleaded guilty to violating the National Motor Theft Act [3] and was placed on probation for one to three years. He attempted suicide, was taken to Gallinger Hospital for observation, and was transferred to St. Elizabeths Hospital, from which he was discharged after two months. In January of 1948, as a result of a conviction in the District of Columbia Municipal Court for passing bad checks, the District Court revoked his probation and he commenced service of his Motor Theft sentence. His conduct within the first few days in jail led to a lunacy inquiry in the Municipal Court where a jury found him to be of unsound mind. Upon commitment to St. Elizabeths, he was diagnosed as suffering from "psychosis with psychopathic personality." After 15 months of treatment, he was discharged in July 1949 as "recovered" and was returned to jail to serve the balance of his sentence. In June 1950 he was conditionally released. He violated the conditions by leaving the District. When he learned of a warrant for his arrest as a parole violator, he fled to the "South and Midwest obtaining money by passing a number of bad checks." After he was found and returned to the District, the Parole Board referred him to the District Court for a lunacy inquisition, wherein a jury again found him to be of unsound mind. He was readmitted to St. Elizabeths in February 1951. This time the diagnosis was "without mental disorder, psychopathic personality." He was discharged for the third time in May 1951. The housebreaking which is the subject of the present appeal took place two months later, on July 13, 1951.

According to his mother and the psychiatrist who examined him in September 1951, he suffered from hallucinations immediately after his May 1951 discharge from St. Elizabeths. Following the present indictment, in October 1951, he was adjudged of unsound mind in proceedings under § 4244 of Title 18 U.S.C., upon the affidavits of two psychiatrists that he suffered from "psychosis with psychopathic personality." He was committed to St. Elizabeths for the fourth time and given subshock insulin therapy. This commitment lasted 16 months—until February 1953—when he was released to the custody of the District Jail on the certificate of Dr. Silk, Acting Superintendent of St. Elizabeths, that he was "mentally competent to stand trial and * * * able to consult

1. D.C.Code §§ 22–1801, 22–2201 and 22–2202 (1951).

2. Because the questions raised are of general and crucial importance, we called upon the Government and counsel whom we appointed for the indigent appellant to brief and argue this case a second time. Their able presentations have been of great assistance to us. On the question of the adequacy of prevailing tests of criminal responsibility, we received further assistance from the able brief and argument of Abram Chayes, *amicus curiae* by appointment of this Court, in Stewart v. United States, 94 U.S.App. D.C. —, 214 F.2d 879.

3. 18 U.S.C. § 408 (1946). 1948 Revision, 18 U.S.C. §§ 10, 2311–2313.

with counsel to properly assist in his own defense."

He was thereupon brought before the court on the charge involved here. The prosecutor told the court:

"So I take this attitude, in view of the fact that he has been over there [St. Elizabeths] a couple of times and these cases that were charged against him were dropped, I don't think I should take the responsibility of dropping these cases against him; then Saint Elizabeths would let him out on the street, and if that man committed a murder next week then it is my responsibility. So we decided to go to trial on one case, that is the case where we found him right in the house, and let him bring in the defense, if he wants to, of unsound mind at the time the crime was committed, and then Your Honor will find him on that, and in your decision send him back to Saint Elizabeths Hospital, and then if they let him out on the street it is their responsibility."

Shortly thereafter, when the question arose whether Durham could be considered competent to stand trial merely on the basis of Dr. Silk's ex parte statement, the court said to defense counsel:

"I am going to ask you this, Mr. Ahern: I have taken the position that if once a person has been found of unsound mind after a lunacy hearing, an ex parte certificate of the superintendent of Saint Eliza-

beths is not sufficient to set aside that finding and I have held another lunacy hearing. That has been my custom. However, if you want to waive that you may do it, if you admit that he is now of sound mind."

█ The court accepted counsel's waiver on behalf of Durham, although it had been informed by the prosecutor that a letter from Durham claimed need of further hospitalization, and by defense counsel that "* * * the defendant does say that even today he thinks he does need hospitalization; he told me that this morning."[4] Upon being so informed, the court said, "Of course, if I hold he is not mentally competent to stand trial I send him back to Saint Elizabeths Hospital and they will send him back again in two or three months."[5] In this atmosphere Durham's trial commenced.

█ His conviction followed the trial court's rejection of the defense of insanity in these words:

"I don't think it has been established that the defendant was of unsound mind as of July 13, 1951, in the sense that he didn't know the difference between right and wrong or that even if he did, he was subject to an irresistible impulse by reason of the derangement of mind.

"While, of course, the burden of proof on the issue of mental capacity to commit a crime is upon the Government, just as it is on every

---

4. Durham showed confusion when he testified. These are but two examples:
   "Q. Do you remember writing it? A. No. Don't you forget? People get all mixed up in machines.
   "Q. What kind of a machine? A. I don't know, they just get mixed up.
   "Q. Are you cured now? A. No, sir.
   "Q. In your opinion? A. No, sir.
   "Q. What is the matter with you? A. You hear people bother you.
   "Q. What? You say you hear people bothering you? A. Yes.
   "Q. What kind of people? What do they bother you about? A. (No response.)"

Although we think the court erred in accepting counsel's admission that Durham was of sound mind, the matter does not require discussion since we reverse on other grounds and the principles governing this issue are fully discussed in our decision today in Gunther v. United States, 94 U.S.App.D.C. ——, 215 F.2d 493.

5. The court also accepted a waiver of trial by jury when Durham indicated, in response to the court's question, that he preferred to be tried without a jury and that he waived his right to a trial by jury.

other issue, nevertheless, the Court finds that there is not sufficient to contradict the usual presumption of [sic] the usual inference of sanity.

*"There is no testimony concerning the mental state of the defendant as of July 13, 1951, and therefore the usual presumption of sanity governs.*

*"While if there was some testimony as to his mental state as of that date to the effect that he was incompetent on that date, the burden of proof would be on the Government to overcome it. There has been no such testimony, and the usual presumption of sanity prevails.*

\*   \*   \*   \*   \*   \*

"Mr. Ahern, I think you have done very well by your client and defended him very ably, but I think under the circumstances there is nothing that anybody could have done." [Emphasis supplied.]

We think this reflects error requiring reversal.

In Tatum v. United States we said, "When lack of mental capacity is raised as a defense to a charge of crime, the law accepts the general experience of mankind and presumes that all people, including those accused of crime, are sane."[6] So long as this presumption prevails, the prosecution is not required to prove the defendant's sanity. But "as soon as 'some evidence of mental disorder is introduced, * * * sanity, like any other fact, must be proved as part of the prosecution's case beyond a reasonable doubt.' "[7] Here it appears that the trial judge recognized this rule but failed to find "some evidence." We hold that the court erred and that the requirement of "some evidence" was satisfied.[8]

In Tatum we held that requirement satisfied by considerably less than is present here. Tatum claimed lack of memory concerning the critical events and three lay witnesses testified that he appeared to be in "more or less of a trance," or "abnormal," but two psychiatrists testified that he was of "sound mind" both at the time of examination and at the time of the crime. Here, the psychiatric testimony was unequivocal that Durham was of unsound mind at the time of the crime. Dr. Gilbert, the only expert witness heard,[9] so stated at least four times. This crucial testimony is set out in the margin.[10] Intensive questioning by the court failed to pro-

6. 1951, 88 U.S.App.D.C. 386, 389, 190 F. 2d 612, 615.

7. 88 U.S.App.D.C. at page 389, 190 F.2d at page 615, quoting Glueck, Mental Disorder and the Criminal Law 41–42 (1925).

8. In its brief, the prosecution confounds the "some evidence" test with the "evidence sufficient to create a reasonable doubt" test, despite our explanation in Tatum that the " 'evidence sufficient to create a reasonable doubt' test" applies only after the issue has been raised by "some evidence" and the burden is already upon the Government to prove the defendant's sanity beyond a reasonable doubt. 88 U.S.App.D.C. at page 390, 190 F.2d at page 616.

9. Dr. Amino Perretti, who also examined Durham in connection with those proceedings and furnished an affidavit that Durham was of unsound mind, was unable to testify due to illness.

10. (1) "Q. [Mr. Ahern]. As a result of those examinations did you reach a conclusion as to the sanity or insanity of the defendant? A. Yes, I did arrive at an opinion as to his mental condition.

"Q. And what is that opinion? A. That he at that time was of unsound mind.

"Q. Can you tell us what disorder he was suffering from, Doctor? A. The report of his case at the time, as of October 9, 1951, I used the diagnosis of undifferentiated psychosis, but according to the record the diagnosis was at the time of commitment psychosis with psychopathic personality.

\*   \*   \*   \*   \*

"Q. At that time were you able to make a determination as to how long this condition had existed? A. According to the record I felt at the time that he had been in that attitude or mental disorder for a period of some few to several months."

(2) "Q. [Mr.Ahern]. Directing your

duce any retraction of Dr. Gilbert's testimony that the "period of insanity would have embraced the date July 13, 1951." And though the prosecution sought unsuccessfully in its cross- and recross-examination of Dr. Gilbert to establish that Durham was a malingerer who feigned insanity whenever he was trapped for his misdeeds, it failed to present any expert testimony to support this theory. In addition to Dr. Gilbert's testimony, there was testimony by Durham's mother to the effect that in the interval between his discharge from St. Elizabeths in May 1951, and the crime "he seemed afraid of people" and had urged her to put steel bars on his bedroom windows.

Apparently the trial judge regarded this psychiatric testimony as "no testimony" on two grounds: (1) it did not adequately cover Durham's condition on July 13, 1951, the date of the offense; and (2) it was not directed to Durham's capacity to distinguish between right and wrong. We are unable to agree that for either of these reasons the psychiatric testimony could properly be considered "no testimony."

(1) Following Dr. Gilbert's testimony that the condition in which he found Durham on September 3, 1951 was progressive and did not "arrive overnight," Dr. Gilbert responded to a series of questions by the court:

"Q. [Court]. Then is it reasonable to assume that it is not possible to determine *how far* this state of unsound mind had progressed by July 13th? Isn't that so? A. [Dr. Gilbert]. As to the seriousness of the symptoms as compared with them and the time I observed him, that's true, except that his travels were based, according to his statement to me, on certain of the symptoms and his leaving Washington, his giving up his job and work and leaving the work that he had tried to do.

"Q. But you can't tell, can you, *how far* those symptoms had progressed and become worse by the

attention specifically to July 13, 1951, will you give us your opinion as to the mental condition of the defendant at that time? A. From my previous testimony and previous opinion, to repeat, it was my opinion that he had been of unsound mind from sometime not long after a previous release from Saint Elizabeths Hospital [*i. e.*, May 14, 1951]."

(3) "Q. [Mr. Ahern]. In any event, Doctor, is it your opinion that that period of insanity would have embraced the date July 13, 1951? A. Yes. My examination would antedate that; that is, the symptoms obtained, according to my examinations, included that—the symptoms of the mental disorder.

"Q. Can you tell us what symptoms you found, Doctor? A. Well, he was trying to work for a while, he stated, and while he was working at one of these People's Drug Stores he began to hear false voices and suffer from hallucinations and believed that the other employees and others in the store talked about him, watched him, and the neighbors did the same, watching him from their windows, talking about him, and those symptoms continued and were present through the time that I examined him in September and October.

* * * * *

"Q. [Mr. McLaughlin]. You were asked the specific question, Doctor, whether or not in your opinion on July 13, 1951, this defendant was of unsound mind and didn't know the difference between right and wrong. Can you express an opinion as to that? A. Yes. It is my opinion he was of unsound mind."

(4) "Q. [Mr. McLaughlin]. Can you tell us—this is for my own information, I would like to know this—you say that this defendant, at the time you examined him in 1951 was of unsound mind and had been of unsound mind sometime prior to that; is that your statement? A. Yes, sir.

"Q. Can you tell us how long prior to that time he was of unsound mind? A. Well, while he was working in People's Drug Store the symptoms were present, and how long before that, I didn't get the date of that.

"Q. When was he working in People's Drug Store?

* * * * *

"A. Sometime after his discharge from Saint Elizabeths Hospital.

"Q. In 1947? A. Oh, no; 1951."

13th of July? A. No, not *how far* they were, that is correct." [Emphasis supplied.]

Thereafter, when the prosecutor on re-cross asked Dr. Gilbert whether he would change his opinion concerning Durham's mental condition on July 13, 1951, if he knew that Durham had been released from St. Elizabeths just two months before as being of sound mind, the court interrupted to say: "Just a minute. The Doctor testified in answer to my question that he doesn't know and he can't express a definite opinion as to his mental condition on the 13th of July." This, we think, overlooks the witness' unequivocal testimony on direct and cross-examination,[11] and misconceives what he had said in response to questioning by the court, namely, that certain symptoms of mental disorder antedated the crime, although it was impossible to say how far they had progressed.

Moreover, any conclusion that there was "no testimony" regarding Durham's mental condition at the time of the crime disregards the testimony of his mother. Her account of his behavior after his discharge from St. Elizabeths in May 1951 was directly pertinent to the issue of his sanity at the time of the crime.

(2) On re-direct examination, Dr. Gilbert was asked whether he would say that Durham "knew the difference between right and wrong on July 13, 1951; that is, his ability to distinguish between what was right and what was wrong." He replied: "As I have stated before, if the question of the right and wrong were propounded to him he could give you the right answer." Then the court interrupted to ask:

"The Court. No, I don't think that is the question, Doctor—not whether he could give a right answer to a question, but whether he, himself, knew the difference between right and wrong in connection with governing his own actions. * * * If you are unable to answer, why,

you can say so; I mean, if you are unable to form an opinion.

"The Witness. I can only answer this way: That I can't tell how much the abnormal thinking and the abnormal experiences in the form of hallucinations and delusions—delusions of persecution—had to do with his anti-social behavior.

"I don't know how anyone can answer that question categorically, except as one's experience leads him to know that most mental cases can give you a categorical answer of right and wrong, but what influence these symptoms have on abnormal behavior or anti-social behavior—

"The Court. Well, your answer is that you are unable to form an opinion, is that it?

"The Witness. I would say that that is essentially true, for the reasons that I have given."

Later, when defense counsel sought elaboration from Dr. Gilbert on his answers relating to the "right and wrong" test, the court cut off the questioning with the admonition that "you have answered the question, Doctor."

The inability of the expert to give categorical assurance that Durham was unable to distinguish between right and wrong did not destroy the effect of his previous testimony that the period of Durham's "insanity" embraced July 13, 1951. It is plain from our decision in Tatum that this previous testimony was adequate to prevent the presumption of sanity from becoming conclusive and to place the burden of proving sanity upon the Government. None of the testimony before the court in Tatum was couched in terms of "right and wrong."

Finally, even assuming *arguendo* that the court, contrary to the plain meaning of its words, recognized that the prosecution had the burden of proving Durham's sanity, there would still be a fatal error. For once the issue of

11. See note 10, supra.

insanity is raised by the introduction of "some evidence," so that the presumption of sanity is no longer absolute, it is incumbent upon the trier of fact to weigh and consider "the whole evidence, including that supplied by the presumption of sanity \* \* \*" on the issue of "the capacity in law of the accused to commit" the crime.[12] Here, manifestly, the court as the trier of fact did not and could not weigh "the whole evidence," for it found there was "no testimony concerning the mental state" of Durham.

For the foregoing reasons, the judgment is reversed and the case is remanded for a new trial.

## II.

It has been ably argued by counsel for Durham that the existing tests in the District of Columbia for determining criminal responsibility, i. e., the so-called right-wrong test supplemented by the irresistible impulse test, are not satisfactory criteria for determining criminal responsibility. We are urged to adopt a different test to be applied on the retrial of this case. This contention has behind it nearly a century of agitation for reform.

A. The right-wrong test, approved in this jurisdiction in 1882,[13] was the exclusive test of criminal responsibility in the District of Columbia until 1929 when we approved the irresistible impulse test as a supplementary test in Smith v. United States.[14] The right-wrong test has its roots in England. There, by the first quarter of the eighteenth century, an accused escaped punishment if he could not distinguish "good and evil," i. e., if he "doth not know what he is doing, no more than \* \* \* a wild beast." [15] Later in the same century, the "wild beast" test was abandoned and "right and wrong" was substituted for "good and evil." [16] And toward the middle of the nineteenth century, the House of Lords in the famous M'Naghten case [17] restated what had become the accepted "right-wrong" test [18] in a form which has since been followed, not only in England [19] but in most American jurisdictions [20] as an exclusive test of criminal responsibility:

"\* \* \* the jurors ought to be told in all cases that every man is to

---

12. Davis v. United States, 1895, 160 U.S. 469, 488, 16 S.Ct. 353, 358, 40 L.Ed. 499.

13. 1882, 12 D.C. 498, 550, 1 Mackey 498, 550. The right-wrong test was reaffirmed in United States v. Lee, 1886, 15 D.C. 489, 496, 4 Mackey 489, 496.

14. 1929, 59 App.D.C. 144, 36 F.2d 548, 70 A.L.R. 654.

15. Glueck, Mental Disorder and the Criminal Law 138–39 (1925), citing Rex v. Arnold, 16 How.St.Tr. 695, 764 (1724).

16. Id. at 142–52, citing Earl Ferrer's case, 19 How.St.Tr. 886 (1760). One writer has stated that these tests originated in England in the 13th or 14th century, when the law began to define insanity in terms of intellect for purposes of determining capacity to manage feudal estates. Comment, Lunacy and Idiocy—The Old Law and Its Incubus, 18 U. of Chi.L.Rev. 361 (1951).

17. 8 Eng.Rep. 718 (1843).

18. Hall, Principles of Criminal Law 480, n. 6 (1947).

19. Royal Commission on Capital Punishment 1949–1953 Report (Cmd. 8932) 79 (1953) (hereinafter cited as Royal Commission Report).

20. Weihofen, The M'Naghten Rule in Its Present Day Setting, Federal Probation 8 (Sept. 1953); Weihofen, Insanity as a Defense in Criminal Law 15, 64–68, 109–47 (1933); Leland v. State of Oregon, 1952, 343 U.S. 790, 800, 72 S.Ct. 1002, 96 L.Ed. 1302.

"In five States the M'Naghten Rules have been in substance re-enacted by statute." Royal Commission Report 409; see, e. g., "Sec. 1120 of the [New York State] Penal Law [McK.Consol. Laws, c. 40] [which] provides that a person is not excused from liability on the grounds of insanity, idiocy or imbecility, except upon proof that at the time of the commission of the criminal act he was laboring under such a defect of reason as (1) not to know the nature and quality of the act he was doing or (2) not to know that the act was wrong." Ploscowe, Suggested Changes in the New York Laws and Procedures Relating to the Criminally Insane and

870

be presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary be proved to their satisfaction; and that, to establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know he was doing what was wrong." [21]

As early as 1838, Isaac Ray, one of the founders of the American Psychia-

tric Association, in his now classic Medical Jurisprudence of Insanity, called knowledge of right and wrong a "fallacious" test of criminal responsibility.[22] This view has long since been substantiated by enormous developments in knowledge of mental life.[23] In 1928 Mr. Justice Cardozo said to the New York Academy of Medicine: "Everyone concedes that the present [legal] definition of insanity has little relation to the truths of mental life." [24]

Medico-legal writers in large number,[25] The Report of the Royal Commission on Capital Punishment 1949–1953,[26] and The Preliminary Report by the Committee on Forensic Psychiatry of the

*Mentally Defective Offenders*, 43 J. Crim.L., Criminology & Police Sci. 312, 314 (1952).

21. 8 Eng.Rep. 718, 722 (1843). "Today, Oregon is the only state that requires the accused, on a plea of insanity, to establish that defense beyond a reasonable doubt. Some twenty states, however, place the burden on the accused to establish his insanity by a preponderance of the evidence or some similar measure of persuasion." Leland v. State of Oregon, supra, note 20, 343 U.S. at page 798, 72 S.Ct. 1002. Since Davis v. United States, 1895, 160 U.S. 469, 484, 16 S.Ct. 353, 40 L.Ed. 499, a contrary rule of procedure has been followed in the Federal courts. For example, in compliance with Davis, we held in Tatum v. United States, supra, note 8, 88 U.S.App.D.C. 386, 389, 190 F.2d 612, 615, and text, "as soon as 'some evidence of mental disorder is introduced, * * * sanity, like any other fact, must be proved as part of the prosecution's case beyond a reasonable doubt.' "

22. Ray, Medical Jurisprudence of Insanity 47 and 34 et seq. (1st ed. 1838). "That the insane mind is not entirely deprived of this power of moral discernment, but in many subjects is perfectly rational, and displays the exercise of a sound and well balanced mind is one of those facts now so well established, that to question it would only betray the height of ignorance and presumption." Id. at 32.

23. See Zilboorg, *Legal Aspects of Psychiatry* in One Hundred Years of American Psychiatry 1844–1944, 507, 552 (1944).

24. Cardozo, What Medicine Can Do For the Law 32 (1930).

25. For a detailed bibliography on Insanity as a Defense to Crime, see 7 The Record of the Association of the Bar of the City of New York 158–62 (1952). And see, *e. g.*, Alexander, the Criminal, the Judge and the Public 70 et seq. (1931); Cardozo, What Medicine Can Do For the Law 28 et seq. (1930); Cleckley, the Mask of Sanity 491 et seq. (2d ed.1950); Deutsch, The Mentally Ill In America 389–417 (2d ed.1949); Glueck, Mental Disorder and the Criminal Law (1925), Crime and Justice 96 et seq. (1936); Guttmacher & Weihofen, Psychiatry and the Law 218, 403–23 (1952); Hall, Principles of Criminal Law 477–538 (1947); Menninger, The Human Mind 450 (1937); Hall & Menninger, *"Psychiatry and the Law"—A Dual Review*, 38 Iowa L.Rev. 687 (1953); Overholser, The Psychiatrist and the Law 41–43 (1953); Overholser & Richmond, Handbook of Psychiatry 208–15 (1947); Ploscowe, *Suggested Changes in the New York Laws and Procedures Relating to the Criminally Insane and Mentally Defective Offenders*, 43 J.Crim.L., Criminology & Police Sci. 312, 314 (1952); Ray, Medical Jurisprudence of Insanity (1st ed.1838) (4th ed.1860); Reik, *The Doe-Ray Correspondence: A Pioneer Collaboration in the Jurisprudence of Mental Disease*, 63 Yale L.J. 183 (1953); Weihofen, Insanity as a Defense in Criminal Law (1933), *The M'Naghten Rule in Its Present Day Setting*, Federal Probation 8 (Sept. 1953); Zilboorg, Mind, Medicine and Man 246–97 (1943), *Legal Aspects of Psychiatry*, American Psychiatry 1844–1944, 507 (1944).

26. Royal Commission Report 73–129.

Group for the Advancement of Psychiatry [27] present convincing evidence that the right-and-wrong test is "based on an entirely obsolete and misleading conception of the nature of insanity." [28] The science of psychiatry now recognizes that a man is an integrated personality and that reason, which is only one element in that personality, is not the sole determinant of his conduct. The right-wrong test, which considers knowledge or reason alone, is therefore an inadequate guide to mental responsibility for criminal behavior. As Professor Sheldon Glueck of the Harvard Law School points out in discussing the right-wrong tests, which he calls the knowledge tests:

"It is evident that the knowledge tests unscientifically abstract out of the mental make-up but one phase or element of mental life, the cognitive, which, in this era of dynamic psychology, is beginning to be regarded as not the most important factor in conduct and its disorders. In brief, these tests proceed upon the following questionable assumptions of an outworn era in psychiatry: (1) that lack of knowledge of the 'nature or quality' of an act (assuming the meaning of such terms to be clear), or incapacity to know right from wrong, is the sole or even the most important symptom of mental disorder; (2) that such knowledge is the sole instigator and guide of conduct, or at least the most important element therein, and consequently should be the sole criterion of responsibility when insanity is involved; and (3) that the capacity of knowing right from wrong can be completely intact and functioning perfectly even though a defendant is otherwise demonstrably of disordered mind." [29]

Nine years ago we said:

"The modern science of psychology * * * does not conceive that there is a separate little man in the top of one's head called reason whose function it is to guide another unruly little man called instinct, emotion, or impulse in the way he should go." [30]

By its misleading emphasis on the cognitive, the right-wrong test requires court

27. The Committee on Forensic Psychiatry (whose report is hereinafter cited as Gap Report) was composed of Drs. Philip Q. Roche, Frank S. Curran, Lawrence Z. Freedman and Manfred S. Guttmacher. They were assisted in their deliberations by leading psychiatrists, jurists, law professors, and legal practitioners.

28. Royal Commission Report 80.

29. Glueck, *Psychiatry and the Criminal Law,* 12 Mental Hygiene 575, 580 (1928), as quoted in Deutsch, The Mentally Ill in America 396 (2d ed. 1949); and see, *e. g.,* Menninger, The Human Mind 450 (1937); Guttmacher & Weihofen, Psychiatry and the Law 403–08 (1952).

30. Holloway v. United States, 1945, 80 U.S.App.D.C. 3, 5, 148 F.2d 665, 667, certiorari denied, 1948, 334 U.S. 852, 68 S.Ct. 1507, 92 L.Ed. 1774.

More recently, the Royal Commission, after an exhaustive survey of legal, medical and lay opinion in many Western countries, including England and the United States made a similar finding. It reported:

"The gravamen of the charge against the M'Naghten Rules is that they are not in harmony with modern medical science, which, as we have seen, is reluctant to divide the mind into separate compartments—the intellect, the emotions and the will—but looks at it as a whole and considers that insanity distorts and impairs the action of the mind as a whole." Royal Commission Report 113. The Commission lends vivid support to this conclusion by pointing out that "It would be impossible to apply modern methods of care and treatment in mental hospitals, and at the same time to maintain order and discipline, if the great majority of the patients, even among the grossly insane, did not know what is forbidden by the rules and that, if they break them, they are liable to forfeit some privilege. Examination of a number of individual cases in which a verdict of guilty but insane [the nearest English equivalent of our acquittal by reason of insanity] was returned, and rightly returned, has convinced us that there are few indeed where the accused can truly be said not to have known that his act was wrong." Id. at 103.

and jury to rely upon what is, scientifically speaking, inadequate, and most often, invalid [31] and irrelevant testimony in determining criminal responsibility.[32]

The fundamental objection to the right-wrong test, however, is not that criminal irresponsibility is made to rest upon an inadequate, invalid or indeterminable symptom or manifestation, but that it is made to rest upon *any* particular symptom.[33] In attempting to define insanity in terms of a symptom, the courts have assumed an impossible role,[34] not merely one for which they have no special competence.[35] As the Royal Commission emphasizes, it is dangerous "to abstract particular mental faculties, and to lay it down that unless these particular faculties are destroyed or gravely impaired, an accused person, whatever the nature of his mental disease, must be held to be criminally responsible * * *."[36] In this field of law as in others, the fact finder should be free to consider all information advanced by relevant scientific disciplines.[37]

Despite demands in the name of scientific advances, this court refused to alter the right-wrong test at the turn of the century.[38] But in 1929, we reconsidered in response to "the cry of scientific experts" and added the irresistible impulse

31. See Guttmacher & Weihofen, Psychiatry and the Law 421, 422 (1952). The M'Naghten rules "constitute not only an arbitrary restriction on vital medical data, but also impose an improper onus of decision upon the expert witness. The Rules are unanswerable in that they have no consensus with established psychiatric criteria of symptomatic description save for the case of disturbed consciousness or of idiocy, * * *." From statement by Dr. Philip Q. Roche, quoted id. at 407. See also United States ex rel. Smith v. Baldi, 3 Cir., 1951, 192 F.2d 540, 567 (dissenting opinion).

32. In a very recent case, the Supreme Court of New Mexico recognized the inadequacy of the right-wrong test, and adopted what it called an "extension of the M'Naghten Rules." Under this extension, lack of knowledge of right and wrong is not essential for acquittal "if, by reason of disease of the mind, defendant has been deprived of or lost the power of his will * * *." State v. White, N.M., 270 P.2d 727, 730.

33. Deutsch, The Mentally Ill in America 400 (2d ed.1949); Keedy, *Irresistible Impulse as a Defense in Criminal Law*, 100 U. of Pa.L.Rev. 956, 992 (1952).

34. Professor John Whitehorn of the Johns Hopkins Medical School, who recently prepared an informal memorandum on this subject for a Commission on Legal Psychiatry appointed by the Governor of Maryland, has said: "Psychiatrists are challenged to set forth a crystal-clear statement of what constitutes insanity. It is impossible to express this adequately in words, alone, since such diagnostic judgments involve clinical skill and experience which cannot wholly be verbalized. * * * The medical profession would be baffled if asked to write into the legal code universally valid criteria for the diagnosis of the many types of psychotic illness which may seriously disturb a person's responsibility, and even if this were attempted, the diagnostic criteria would have to be rewritten from time to time, with the progress of psychiatric knowledge." Quoted in Guttmacher & Weihofen, Psychiatry and the Law 419–20 (1952).

35. "* * * the legal profession were invading the province of medicine, and attempting to install old exploded medical theories in the place of facts established in the progress of scientific knowledge." State v. Pike, 1870, 49 N.H. 399, 438.

36. Royal Commission Report 114. And see State v. Jones, 1871, 50 N.H. 369, 392–393.

37. Keedy, *Irresistible Impulse as a Defense in Criminal Law*, 100 U. of Pa.L. Rev. 956, 992–93 (1952).

38. See, e. g., Taylor v. United States, 1895, 7 App.D.C. 27, 41–44, where we rejected "emotional insanity" as a defense, citing with approval the following from the trial court's instruction to the jury: "Whatever may be the cry of scientific experts, the law does not recognize, but condemns the doctrine of emotional insanity—that a man may be sane up until a moment before he commits a crime, insane while he does it, and sane again soon afterwards. Such a doctrine would be dangerous in the extreme. The law does not recognize it; and a jury cannot without violating their oaths." This position was emphatically reaffirmed in Snell v. United States, 1900, 16 App.D.C. 501, 524.

test as a supplementary test for determining criminal responsibility. Without "hesitation" we declared, in Smith v. United States, "it to be the law of this District that, in cases where insanity is interposed as a defense, and the facts are sufficient to call for the application of the rule of irresistible impulse, the jury should be so charged." [39] We said:

"* * * The modern doctrine is that the degree of insanity which will relieve the accused of the consequences of a criminal act must be such as to create in his mind an uncontrollable impulse to commit the offense charged. This impulse must be such as to override the reason and judgment and obliterate the sense of right and wrong to the extent that the accused is deprived of the power to choose between right and wrong. The mere ability to distinguish right from wrong is no longer the correct test either in civil or criminal cases, where the defense of insanity is interposed. The accepted rule in this day and age, with the great advancement in medical science as an enlightening influence on this subject, is that the accused must be capable, not only of distinguishing between right and wrong, but that he was not impelled to do the act by an irresistible impulse, which means before it will justify a verdict of acquittal that his reasoning powers were so far dethroned by his diseased mental condition as to deprive him of the will power to resist the insane impulse to perpetrate the deed, though knowing it to be wrong." [40]

As we have already indicated, this has since been the test in the District.

Although the Smith case did not abandon the right-wrong test, it did liberate the fact finder from exclusive reliance upon that discredited criterion by allowing the jury to inquire also whether the accused suffered from an undefined "diseased mental condition [which] deprive[d] him of the will power to resist the insane impulse * * *." [41] The term "irresistible impulse," however, carries the misleading implication that "diseased mental condition[s]" produce only sudden, momentary or spontaneous inclinations to commit unlawful acts. [42]

As the Royal Commission found:

"* * * In many cases * * * this is not true at all. The sufferer from [melancholia, for example] experiences a change of mood which alters the whole of his existence. He may believe, for instance, that a future of such degradation and misery awaits both him and his family that death for all is a less dreadful alternative. Even the thought that the acts he contemplates are murder and suicide pales into insignificance in contrast with what he otherwise expects. The criminal act, in such circumstances, may be the reverse of impulsive. It may be coolly and carefully prepared; yet it is still the act of a madman. This is merely an illustration; similar states of mind are likely to lie behind the criminal act when murders are committed by persons suffering from schizophrenia or paranoid psy-

39. 1929, 59 App.D.C. 144, 146, 36 F.2d 548, 550, 70 A.L.R. 654.

40. 59 App.D.C. at page 145, 36 F.2d at page 549.

41. 59 App.D.C. at page 145, 36 F.2d at page 549.

42. Impulse, as defined by Webster's New International Dictionary (2d ed.1950), is:
"1. Act of impelling, or driving on-

ward with *sudden* force; impulsion, esp. force so communicated as to produce motion *suddenly*, or *immediately* * *.
"2. An incitement of the mind or spirit, esp. in the form of an *abrupt* and vivid suggestion, prompting some *unpremeditated* action or leading to unforeseen knowledge or insight; a *spontaneous* inclination * * *.
"3. * * * motion produced by a *sudden* or *momentary* force * * *."
[Emphasis supplied.]

choses due to disease of the brain."[43]

■ We find that as an exclusive criterion the right-wrong test is inadequate in that (a) it does not take sufficient account of psychic realities and scientific knowledge, and (b) it is based upon one symptom and so cannot validly be applied in all circumstances. We find that the "irresistible impulse" test is also inadequate in that it gives no recognition to mental illness characterized by brooding and reflection and so relegates acts caused by such illness to the application of the inadequate right-wrong test. We conclude that a broader test should be adopted.[44]

■■ B. In the District of Columbia, the formulation of tests of criminal responsibility is entrusted to the courts[45] and, in adopting a new test, we invoke our inherent power to make the change prospectively.[46]

■ The rule we now hold must be applied on the retrial of this case and in future cases is not unlike that followed by the New Hampshire court since 1870.[47] It is simply that an accused is not criminally responsible if

43. Royal Commission Report 110; for additional comment on the irresistible impulse test, see Glueck, Crime and Justice 101–03 (1936); Guttmacher & Weihofen, Psychiatry and the Law 410–12 (1952); Hall, General Principles of Criminal Law 505–26 (1947); Keedy, *Irresistible Impulse as a Defense in Criminal Law*, 100 U. of Pa.L.Rev. 956 (1952); Wertham, The Show of Violence 14 (1949).

The New Mexico Supreme Court in recently adopting a broader criminal insanity rule, note 32, supra, observed: "* * * insanity takes the form of the personality of the individual and, if his tendency is toward depression, his wrongful act may come at the conclusion of a period of complete lethargy, thoroughly devoid of excitement."

44. As we recently said, "* * * former common law should not be followed where changes in conditions have made it obsolete. We have never hesitated to exercise the usual judicial function of revising and enlarging the common law." Linkins v. Protestant Episcopal Cathedral Foundation, 1950, 87 U.S.App.D.C. 351, 355, 187 F.2d 357, 361, 28 A.L.R.2d 521. Cf. Funk v. United States, 1933, 290 U.S. 371, 381–382, 54 S.Ct. 212, 78 L.Ed. 369.

45. Congress, like most State legislatures, has never undertaken to define insanity in this connection, although it recognizes the fact that an accused may be acquitted by reason of insanity. See D.C.Code § 24–301 (1951). And as this court made clear in Hill v. United States, Congress has left no doubt that "common-law procedure, in all matters relating to crime * * * still continues in force here in all cases except where special provision is made by statute to the exclusion of

the common-law procedure." 22 App. D.C. 395, 401 (1903), and statutes cited therein; Linkins v. Protestant Episcopal Cathedral Foundation, 87 U.S.App.D.C. at pages 354–55, 187 F.2d at pages 360–361; and see Fisher v. United States, 1946, 328 U.S. 463, 66 S.Ct. 1318, 90 L. Ed. 1382.

46. See Great Northern R. v. Sunburst Oil & Refining Co., 1932, 287 U.S. 358, 53 S. Ct. 145, 77 L.Ed. 360; National Labor Relations Board v. Guy F. Atkinson Co., 9 Cir., 1952, 195 F.2d 141, 148; Concurring opinion of Judge Frank in Aero Spark Plug Co. v. B. G. Corporation, 2 Cir., 1942, 130 F.2d 290, 298, and note 24; Warring v. Colpoys, 1941, 74 App.D.C. 303, 122 F.2d 642, 645, 136 A.L.R. 1025; Moore & Oglebay, *The Supreme Court, Stare Decisis and Law of the Case*, 21 Texas L.Rev. 514, 535 (1943); Carpenter, *Court Decisions and the Common Law*, 17 Col.L.Rev. 593, 606–07 (1917). But see von Moschzisker, *Stare Decisis in Courts of Last Resort*, 37 Harv.L.Rev. 409, 426 (1924). Our approach is similar to that of the Supreme Court of California in People v. Maughs, 1906, 149 Cal. 253, 86 P. 187, 191, where the court prospectively invalidated a previously accepted instruction, saying:

"* * * we think the time has come to say that in all future cases which shall arise, and where, after this warning, this instruction shall be given, this court will hold the giving of it to be so prejudicial to the rights of a defendant, secured to him by our Constitution and laws, as to call for the reversal of any judgment which may be rendered against him."

47. State v. Pike, 1870, 49 N.H. 399.

his unlawful act was the product of mental disease or mental defect.[48]

■ We use "disease" in the sense of a condition which is considered capable of either improving or deteriorating. We use "defect" in the sense of a condition which is not considered capable of either improving or deteriorating and which may be either congenital, or the result of injury, or the residual effect of a physical or mental disease.

■ Whenever there is "some evidence" that the accused suffered from a diseased or defective mental condition at the time the unlawful act was committed, the trial court must provide the jury with guides for determining whether the accused can be held criminally responsible. We do not, and indeed could not, formulate an instruction which would be either appropriate or binding in all cases. But under the rule now announced, any instruction should in some way convey to the jury the sense and substance of the following: If you the jury believe beyond a reasonable doubt that the accused was not suffering from a diseased or defective mental condition at the time he committed the criminal act charged, you may find him guilty. If you believe he was suffering from a diseased or defective mental condition when he committed the act, but believe beyond a reasonable doubt that the act was not the product of such mental abnormality, you may find him guilty. Unless you believe beyond a reasonable doubt either that he was not suffering from a diseased or defective mental condition, or that the act was not the product of such abnormality, you must find the accused not guilty by reason of insanity. Thus your task would not be completed upon finding, if you did find, that the accused suffered from a mental disease or defect. He would still be responsible for his unlawful act if there was no causal connection between such mental abnormality and the act.[49] These questions must be determined by you from the facts which you find to be fairly deducible from the testimony and the evidence in this case.[50]

■ The questions of fact under the test we now lay down are as capable of determination by the jury as, for example, the questions juries must determine upon a claim of total disability under a policy of insurance where the state of medical knowledge concerning the disease involved, and its effects, is obscure or in conflict. In such cases, the jury is not required to depend on arbitrarily selected "symptoms, phases or manifestations"[51] of the disease as criteria for determining the ultimate questions of fact upon which the claim depends. Similarly, upon a claim of criminal irresponsibility, the jury will not be required to rely on such symptoms as criteria for determining the ultimate question of fact upon which such claim depends. Testimony as to such "symptoms, phases or manifestations," along

---

48. Cf. State v. Jones, 1871, 50 N.H. 369, 398.

49. "There is no *a priori* reason why every person suffering from any form of mental abnormality or disease, or from any particular kind of mental disease, should be treated by the law as not answerable for any criminal offence which he may commit, and be exempted from conviction and punishment. Mental abnormalities vary infinitely in their nature and intensity and in their effects on the character and conduct of those who suffer from them. Where a person suffering from a mental abnormality commits a crime, there must always be some likelihood that the abnormality has played some part in the causation of the crime; and, generally speaking, the graver the abnormality, * * * the more probable it must be that there is a causal connection between them. But the closeness of this connection will be shown by the facts brought in evidence in individual cases and cannot be decided on the basis of any general medical principle." Royal Commission Report 99.

50. The court may always, of course, if it deems it advisable for the assistance of the jury, point out particular areas of agreement and conflict in the expert testimony in each case, just as it ordinarily does in summing up any other testimony.

51. State v. Jones, 1871, 50 N.H. 369, 398.

with other relevant evidence, will go to the jury upon the ultimate questions of fact which it alone can finally determine. Whatever the state of psychiatry, the psychiatrist will be permitted to carry out his principal court function which, as we noted in Holloway v. U. S., "is to inform the jury of the character of [the accused's] mental disease [or defect]."[52] The jury's range of inquiry will not be limited to, but may include, for example, whether an accused, who suffered from a mental disease or defect did not know the difference between right and wrong, acted under the compulsion of an irresistible impulse, or had "been deprived of or lost the power of his will * * *."[53]

Finally, in leaving the determination of the ultimate question of fact to the jury, we permit it to perform its traditional function which, as we said in Holloway, is to apply "our inherited ideas of moral responsibility to individuals prosecuted for crime * * *."[54] Juries will continue to make moral judgments, still operating under the fundamental precept that "Our collective conscience does not allow punishment where it cannot impose blame."[55] But in making such judgments, they will be guided by wider horizons of knowledge concerning mental life. The question will be simply whether the accused acted because of a mental disorder, and not whether he displayed particular symptoms which medical science has long recognized do not necessarily, or even typically, accompany even the most serious mental disorder.[56]

The legal and moral traditions of the western world require that those who, of their own free will and with evil intent (sometimes called *mens rea*), commit acts which violate the law, shall be criminally responsible for those acts. Our traditions also require that where such acts stem from and are the product of a mental disease or defect as those terms are used herein, moral blame shall not attach, and hence there will not be criminal responsibility.[57] The rule we state in this opinion is designed to meet these requirements.

Reversed and remanded for a new trial.

---

52. 1945, 80 U.S.App.D.C. 3, 5, 148 F.2d 665, 667.

53. State v. White, see n. 32, supra.

54. 80 U.S.App.D.C. at page 5, 148 F.2d at page 667.

55. 80 U.S.App.D.C. at pages 4–5, 148 F.2d at pages 666–667.

56. See text, supra, 214 F.2d 870–872.

57. An accused person who is acquitted by reason of insanity is presumed to be insane, Orencia v. Overholser, 1947, 82 U.S.App.D.C. 285, 163 F.2d 763; Barry v. White, 1933, 62 App.D.C. 69, 64 F.2d 707, and may be committed for an indefinite period to a "hospital for the insane." D.C.Code § 24–301 (1951).

We think that even where there has been a specific finding that the accused was competent to stand trial and to assist in his own defense, the court would be well advised to invoke this Code provision so that the accused may be confined as long as "the public safety and * * * [his] welfare" require. Barry v. White, 62 App.D.C. at page 71, 64 F. 2d at page 709.