**UNITED STATES of America,**
**Appellee,**

v.

**Albert MALAFRONTE, Appellant.**

**No. 183, Docket 30086.**

United States Court of Appeals
Second Circuit.

Argued Dec. 15, 1965.

Decided Feb. 28, 1966.

Theodore Krieger, New York City, for appellant.

Richard A. Givens, Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, John E. Sprizzo, Asst. U. S. Atty., on the brief), for appellee.

Before WATERMAN, KAUFMAN and HAYS, Circuit Judges.[*]

KAUFMAN, Circuit Judge.

In this companion appeal to United States v. Freeman, 357 F.2d 606 (2d Cir. 1965), decided today, we are asked to overturn Albert Malafronte's conviction for selling narcotics in violation of 21 U.S.C. §§ 173, 174, on the same grounds as those urged in *Freeman*. Malafronte was tried by Judge Levet without a jury and was sentenced, as a second offender, to ten years' imprisonment. At trial, Malafronte defended on the ground that he was criminally incompetent at the time of the alleged offense and because the trial judge, in assessing this defense, applied a standard which we have today declared in *Freeman* to be outmoded and hence insufficient, we reverse and remand for a new trial.

On the evening of December 5, 1962, narcotics agent James Bailey, working in an undercover capacity, met Malafronte and co-defendant Joe Comager in front of the Senator Bar on 96th Street and Broadway. Malafronte asked Bailey if he was "a friend of Joe's" and upon Bailey's affirmative response, the two entered the bar. Inside, Bailey and Malafronte encountered co-defendant, Ralph Bracco, who, after several drinks, asked Bailey if he was "ready to do business." Bailey acknowledged his readiness, and

* Simultaneously with the circulation of United States v. Freeman, 357 F.2d 606 (2d Cir. 1965), also decided today, this opinion was circulated to all of the active Judges of this Court. See asterisk reference in Freeman at 607.

Bracco suggested after some discussion that the sale take place elsewhere. Accordingly, Bailey left the bar and was driven by Comager to a deserted section of Harlem in the vicinity of 119th Street and the East Side Drive. Bailey and Comager waited in the parked car until Bracco and then Malafronte arrived. Malafronte entered the parked vehicle and handed Bailey a dark gray package sealed with Scotch tape for which Bailey paid Bracco $4000, stating that an additional $600 would be forthcoming in a few days. Chemical analysis established that the package, weighing approximately 215 grams, contained heroin.

Two days later, Bailey met Malafronte and Bracco at a Horn & Hardart's Restaurant on Lexington Avenue and 45th Street. After complaining about the poor quality of the drugs and his loss of money on the transaction, Bailey paid Malafronte the promised $600, but only after exacting from Bracco the assurance that "we will make it up for you on your next deal." [1]

The main thrust of the defense to the government's case at trial consisted of an effort to establish that Malafronte, because of mental incompetency, was not responsible for his acts. In this case, as in *Freeman,* Dr. Herman C. Denber testified as an expert witness for the defense.[2] He stated that he had performed a psychiatric examination of Malafronte on January 23, 1964, at the Federal House of Detention in New York, for the purpose of determining whether the defendant was competent to stand trial. The Doctor's report [3] and testimony at trial revealed that Malafronte was a chronic alcoholic who had consumed two to four pints of rye whiskey daily for a period of fifteen years. As a result, the Doctor said, Malafronte had run the gamut from "passing out" to being hospitalized for delirium tremens, and had suffered several epileptic seizures.

Describing his interview with Malafronte, which lasted for little over one hour, the witness testified that Malafronte, who had an eighth grade education, spoke in a "low, monotonous voice," was rather depressed "and his whole general emotional response was markedly blunted." When Malafronte was asked by the Doctor about the alleged narcotics sale, he replied, "I don't remember selling anything to a federal agent. Most of the time I am drunk. I keep drinking all day long, morning and night. * * * I'd have to be out of my mind if I ever did a thing like that [sell narcotics]."

In summary, Dr. Denber noted that Malafronte was a chronic alcoholic whose heavy drinking had caused damage to the cells of the brain leading to difficulty in making moral judgments and an inability to understand the significance of his acts.

1. Bracco and Comager were indicted with Malafronte as co-defendants. Bracco was a fugitive and Comager pleaded guilty to a superseding indictment; therefore, Malafronte was tried alone.

2. Dr. Denber's qualifications are set forth in *Freeman,* 357 F.2d at 609.

3. Dr. Denber's report recommended that Malafronte be committed to Bellevue Hospital for further psychiatric and neurological examination to determine his competency to be tried. The document states:

> This individual shows a progressive deterioration due to chronic alcoholism. He has signs of organic damage, as evidenced by the convulsive seizures and peripheral neuropathy. It is very questionable if he can be held accountable for any acts that he is alleged to have committed. In view of the history, the shifting nature of his life (his changing from job to job), the great difficulty in interpersonal adaptation, the apathy and dullness, and the emotional reactions, one must consider the possibility of simple schizophrenia.

Upon commitment and examination, Bellevue concluded that Malafronte was competent to stand trial. The Hospital's report to the court described Malafronte's condition this way:

> This man has been a chronic alcoholic for many years and has at times shown some vague paranoid symptomatology commonly seen in alcoholism. There is no present evidence of any psychotic process. He shows no striking organic changes. Epilepsy has been a consideration, but there is no clear record of this either.

In view of this condition, the Doctor stated, it was his opinion that at the time of the alleged sale, Malafronte was unable to distinguish right from wrong within the meaning of the M'Naghten test.[4]

To establish the full extent of Malafronte's alcoholic habit,[5] the defendant's wife was called to testify. Mrs. Malafronte stated that she and the defendant had been married for five years and that for the last two or three years her husband's drinking had become "real bad. * * * All he wanted to do was to go in the bar and drink, that is all he wanted, liquor to drink." Moreover, Mrs. Malafronte said that she provided the sole support for her three children by a previous marriage and gave her husband some "drinking money" every day. When the defendant was not drinking, she noted, he spent most of his time in bed. Asked to describe what she had observed when her husband experienced a convulsive seizure, Mrs. Malafronte explained that, on one occasion, "He was shaking from head to toe, he was very white and shivering and came in with a pint of liquor and he drank it all and before you knew it he gave one loud scream and down he fell in like an epileptic fit."

The government relied upon the psychiatric testimony of Dr. George H. Hyslop to rebut Malafronte's defense of lack of responsibility. Dr. Hyslop had examined the defendant for approximately one hour during the week prior to testifying and had reviewed reports [6] of the defendant's condition. The witness stated that in his opinion Malafronte at the time of the alleged sale was able to distinguish right from wrong. Dr. Hyslop based this conclusion upon Malafronte's ability to engage in purposeful conduct during the transactions in the Senator Bar, East Harlem and the Horn & Hardart's Restaurant. The Doctor noted emphatically, "I don't care what background he [Malafronte] may have with respect to alcohol. There is nothing to indicate that he was drunk and confused and didn't know what he was doing. * * * "

While Dr. Hyslop acknowledged that Malafronte denied any recollection of the narcotics transaction, the government's expert was able to find no evidence of an inability to adjust to life, a characteristic of people suffering from mental disorders. Thus, Dr. Hyslop pointed out that Malafronte had been employed intermittently and possessed "normal sexual instincts." Moreover, the Doctor could find no sign of organic brain damage. He considered Malafronte to be alert and responsive to questions and generally aware of his condition; Malafronte had adjusted well to jail, the expert noted, and during recreation periods had made friends, played cards, viewed television and read newspapers. Finally, Dr. Hyslop observed that Malafronte possessed a psychopathic personality with criminal tendencies; but, the Doctor explained, this characterization meant simply that Malafronte failed to learn from experience and refused "to use good judgment with respect to his drinking habits in spite of knowing what [they are] costing him."

Because of the conflicting conclusions of the defense and government experts, the trial judge was confronted with the problem of determining which testimony to credit. Although noting that the defense medical witness was an "eminent psychiatrist," the District Judge felt constrained to agree with Dr. Hyslop's testimony and concluded that under M'Naghten, Malafronte had failed to raise a reasonable doubt of his competency and capacity to commit the crime with which he was charged.

---

4. As Dr. Denber put it, "anyone whose brain is so saturated with alcohol as is the case with this man, * * * is not capable of distinguishing right from wrong. * * * "

5. Malafronte was not a drug addict.

6. Among the reports Dr. Hyslop had studied were those of Dr. Denber and Belevue Hospital. See note 3, *supra.*

We recognize here, as we did in *Freeman*, that the able District Judge cannot be faulted for relying on the M'Naghten Rules. This test ordinarily augmented by "irresistible impulse," [7] had been commonly employed in the district courts to assess criminal responsibility. Since, as in *Freeman*, we are urged here to declare the M'Naghten Rules no longer the law to be applied in adjudicating criminal responsibility in this Circuit, our extensive discussion in United States v. Freeman, will suffice to explain our conclusions. We reverse and remand for a new trial in light of that opinion. In making this disposition, of course, we are not passing on the merits of the claims in this case.[8] Rather, as in *Freeman*, we are indicating that the test utilized by the court and the framework in which the psychiatrists testified were too restrictive in view of the modern scientific and legal standards to which we have today given recognition.

The Court is indebted to Theodore Krieger, Esq. who represented Malafronte as assigned counsel, for a thorough and effective presentation.

Reversed and remanded.

WATERMAN, Circuit Judge (concurring in the result).

I concur in the result. See my concurring opinion in United States v. Freeman, contemporaneously decided.

---

7. The trial judge did not supplement the M'Naghten Rules with the "irresistible impulse" test because Malafronte's counsel advised the court that "Nowhere during the course of the defense have we ever contended or interposed the defense of irresistible impulse."

In *Freeman*, we made it clear that M'Naghten implemented by "irresistible impulse" was equally unsatisfactory. Moreover, we are unpersuaded by the government's contention that the defense did not offer a proper objection to the Judge's rulings on the test to be applied in assessing Malafronte's criminal responsibility. When questioning Dr. Denber, Malafronte's counsel asked if the defendant was "suffering from a mental disease." The government's objection to this query was sustained, the Court saying, "I don't think this Court has ever adopted the *Durham* [Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L. R.2d 1430] test." Malafronte's counsel then proceeded to frame questions in light of the M'Naghten Rules, but informed the Court, "I just want to get that exception out and go on to something else." For the reasons stated in *Freeman*, we believe the question of M'Naghten's application is properly before this Court.

8. Nor are we to be understood as saying that alcoholism without more constitutes a "disease or defect of the mind."