STATE OF CONNECTICUT *v.* JOHN CONTE

KING, C. J., ALCORN, HOUSE, THIM and RYAN, Js.

Argued November 8—decided November 26, 1968

*Anthony V. DeMayo,* public defender, for the appellant (defendant).

*Richard P. Sperandeo,* assistant state's attorney, with whom, on the brief, were *George R. Tiernan,* state's attorney, *David B. Salzman* and *Robert K. Walsh,* assistant state's attorneys, for the appellee (state).

KING, C. J., The defendant was charged with murder in the second degree in the fatal shooting of Pasquale Caricchio on June 14, 1966. In this appeal from his conviction, the defendant assigns error in the refusal of the court to submit the issue of his sanity to the jury; in the court's refusal to adopt the definition of insanity approved in *United States* v. *Freeman,* 357 F.2d 606 (2d Cir.); and in a ruling on evidence.

### (1)

For convenience, we first take up the claimed error in refusing to adopt the test of insanity approved in the *Freeman* case. Our common-law test

or definition of insanity as a defense to crime provides (1) that an accused, to be the subject of punishment, must have had mind, capacity, reason and understanding sufficient to have enabled him to judge of the nature, character and consequences of the act charged against him, that the act was wrong and criminal, and that the commission of it would justly and properly expose him to punishment; and (2) that, in committing the act, he was not overcome by an irresistible impulse arising from mental disease. *State* v. *Davies,* 146 Conn. 137, 144, 148 A.2d 251, cert. denied, 360 U.S. 921, 79 S. Ct. 1441, 3 L. Ed. 2d 1537; *State* v. *Donahue,* 141 Conn. 656, 664, 109 A.2d 364, cert. denied, 349 U.S. 926, 75 S. Ct. 775, 99 L. Ed. 1257; and *State* v. *Wade,* 96 Conn. 238, 242, 113 A. 458.

Some ten years ago, an attempt was made to induce this court to adopt a definition or test of insanity which at that time had recently been promulgated by the United States Court of Appeals of the District of Columbia in the case of *Durham* v. *United States,* 214 F.2d 862 (D.C. Cir.). We rejected the *Durham* definition, as did many other courts. *State* v. *Davies,* supra, 147; see also *United States* v. *Freeman,* 357 F.2d 606, 621 (2d Cir.). In 1967, the United States Court of Appeals of the Second Circuit, in *United States* v. *Freeman,* supra, 622, approved, as a common-law definition of insanity, a definition propounded in 1962 in a draft of the American Law Institute's proposed Model Penal Code.

There is inherent difficulty in formulating a definition of insanity which is sufficiently specific to permit its accurate application by a jury and which is also broad enough to give effect to advancements in scientific knowledge in the area of mental illness.

Probably no definition can be formulated which is above criticism in all applications. This difficulty is recognized in *United States* v. *Freeman,* supra, 623, 628.

The test of insanity in the Model Penal Code, adopted as a common-law definition in the *Freeman* case, was enacted by our General Assembly as a statutory test to be applied in Connecticut on and after June 13, 1967. Public Acts, 1967, No. 336 (General Statutes § 54-82a).

We find no error in the court's use of our common-law test in the trial of the present case. Obviously, the statutory test did not become effective until long after the conviction of the accused in October of 1966.

## (2)

The next question is whether, under our common-law test, the court was in error in not submitting the issue of insanity to the jury. Insanity, although often referred to as a defense in a criminal case, may more properly be referred to as a fact inconsistent with guilt. Although the state in the first instance may rely on the presumption that all persons accused of crime are sane, as soon as substantial evidence tending to prove insanity comes into the case, the presumption loses all operative effect, and the burden, which rests throughout upon the state, of proving beyond a reasonable doubt each essential element of the crime charged becomes inclusive of the essential elements of the mental condition requisite to legal responsibility under our governing test. *State* v. *Joseph,* 96 Conn. 637, 639, 115 A. 85; *O'Dea* v. *Amodeo,* 118 Conn. 58, 61, 170 A. 486.

Whether, as the defendant claims, there was sub-

stantial evidence of insanity so as to place that issue in the case depends on whether there was evidence sufficient, if credited, to raise a reasonable doubt as to the sanity of the defendant at the time of the homicide.

The state's claims of proof were to the effect that the defendant, while driving in his automobile, saw the car of the decedent, Pasquale Caricchio, parked across the street from a tavern known as the Friendly Tavern; that the defendant waited for Caricchio to come out; and that, when Caricchio appeared, the defendant called him over to the defendant's car and told him that he (the defendant) had a gun and wanted to talk to Caricchio, who was unarmed. Caricchio evinced contempt for the defendant and slapped aside the revolver, which the defendant had pointed at him. The defendant then fired some eight bullets into Caricchio, instantly killing him. The defendant drove from the scene but was soon after overtaken by the police and captured at gunpoint. It is hardly necessary to point out that this evidence in nowise indicated insanity, nor does the defendant make any claim that it did.

The claims of proof of the defendant were that, in October of 1965, he learned that his wife had had improper relations with Caricchio, that the defendant then spoke to his wife, that thereafter she never saw Caricchio again, and that the defendant and his wife continued to live together. Caricchio occasionally taunted the defendant about his wife's prior infidelity when they met on the street. On at least one occasion, Caricchio drove his car in front of the defendant's automobile, and he drove by the defendant's house two or three times a week, at night, blowing his horn. Since the defendant's place of

work was near the Friendly Tavern, which Caricchio frequented, they often met. At such meetings, they quarreled, and Caricchio taunted the defendant about his wife. On the day of the shooting, Caricchio had been sitting in his car in front of the tavern and had made insulting remarks to the defendant as he passed. Later that afternoon, Caricchio drove by the defendant's house, shouting and blowing his horn. The defendant's claims of proof, as disclosed in the finding, did not cover the actual shooting, although the shooting does not appear to have been seriously contested.

The defendant called as witnesses his wife, his mother, and two of his sisters-in-law, who testified that, since his difficulties with Caricchio, the defendant was uncongenial, disagreeable, preoccupied, and like a different person. Obviously, this testimony fell far short of evidence of insanity under our rule. It could not, if credited, raise a reasonable doubt as to the sanity of the defendant and thus warrant a verdict of not guilty on the ground of insanity.

Dr. Marc A. Rubenstein, a psychiatrist called as an expert witness by the defendant, saw him professionally about eight hours after the shooting and at that time talked with him for about two hours at the jail. Subsequently, the doctor had six one-hour interviews with the defendant. Dr. Rubenstein testified that in his opinion, based on these interviews, the defendant could not control his emotions and used poor judgment. All this may well be true. Certainly, the present homicide, like most other homicides, reflected poor judgment on the part of the killer. On the basis of the defendant's claims of proof, hardly any normal person could have controlled his emotions. But Dr. Rubenstein's opinion was not that the defendant could not control his

actions or that his shooting of Caricchio was an action which, because of mental disease, the defendant could not refrain from doing. It is also clear that Dr. Rubenstein gave no opinion on the first branch of our definition, that of capacity to understand the wrongfulness of the commission of the homicide. Thus, the expert testimony was inadequate to raise a reasonable doubt, under our rule, as to the defendant's sanity at the time of the homicide.

It follows that the court was not in error in refusing to submit the issue of insanity to the jury. See *State* v. *Buonomo,* 87 Conn. 285, 288, 87 A. 977.

### (3)

The state offered three color photographs of Caricchio, taken after the shooting, which showed his shirt covered with blood. The state claimed that the color photographs were admissible to show the "appearance of the body . . . regarding the wounds". The finding disclosed an objection but no ground upon which the objection was based. Practice Book § 226; *State* v. *Hanna,* 150 Conn. 457, 460, 191 A.2d 124.

The state had a right to show the jury, as best it could, the location and direction of each bullet wound. The photographs assisted in doing this.

The defendant now claims that the photographs were immaterial because he had admitted the shooting and that in any event they should have been excluded as too gruesome. Neither claim has any merit, even if the finding indicated that either claim had been properly raised. The relevancy of the photographs has already been pointed out. It nowhere appears that the defendant had formally admitted the location and course of the bullets. *Wil-*

*liams* v. *Milner Hotels Co.,* 130 Conn. 507, 510, 36 A.2d 20. The fact that the photographs were in color, or gruesome, did not, under our rule, require their exclusion if they were relevant and material. *State* v. *Hanna,* supra, 461. There was no error in the admission of the three color photographs.

There is no error.

In this opinion the other judges concurred.