UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert LYONS, Defendant-Appellant.

No. 82–3429.

United States Court of Appeals,
Fifth Circuit.

April 22, 1983.

Opinion on Granting of Rehearing En
Banc July 8, 1983.

Julian R. Murray, Jr., New Orleans, La., for defendant-appellant.

John P. Volz, U.S. Atty., Patrick J. Fanning, Harry W. McSherry, Asst. U.S. Attys., New Orleans, La., for plaintiff-appellee.

Before GARZA, POLITZ and JOHNSON, Circuit Judges.

JOHNSON, Circuit Judge:

On October 23, 1981, Robert Lyons, former Sheriff of Washington Parish, Louisiana, was indicted on twelve counts of knowingly and intentionally securing controlled narcotics by misrepresentation, fraud, deception, and subterfuge, violations of 21 U.S.C. § 843(a)(3) and 18 U.S.C. § 2. Prior to trial, Lyons informed the Assistant U.S. Attorney that he intended to rely upon a defense of insanity. *See* Fed.R.Crim.P. 12.-2(b). Specifically, Lyons argued that his "actions were not willful and voluntary because he was suffering from the mental disease and defect of [involuntary] drug addiction as a result of which he lacked substantial capacity to conform his conduct to the requirements of law." In response to the Government's motion in limine, the district court excluded any evidence of Lyons' drug addiction defense. Lyons objected to the trial court's ruling and submitted a proffer of evidence setting forth the specific evidence he relied upon in support of his defense.

Whether the district court properly excluded Lyons' proffered insanity defense is the sole issue before this Court. Constrained by the shackles of precedent, we hold that the district court erred by refusing to allow Lyons to present his insanity defense to the jury. However, we emphasize that we express no opinion as to the proper resolution of this most difficult fact issue upon remand. Whether or not Lyons' involuntary drug addiction constitutes a mental disease or defect that deprived him of the substantial capacity to conform his conduct to the requirements of the law on the dates of the charged offenses is an issue best left to the reasoned consideration of a properly charged jury.

## I. *Lyons' Proffer of Evidence*

As noted previously, the district court ruled in a pre-trial hearing that Lyons would not be allowed to present evidence to the jury concerning his involuntary drug addiction. Deprived of his sole defense by the district court's ruling, the defendant stipulated that "... the evidence to be offered by the government in the trial of [the] matter would support a finding of guilt of the defendant Robert Lyons on each and every count of the indictment, absent the evidence proffered by the defendant." *See* Record, vol. I at 193–94. Lyons reoffered his proffer of evidence, the district court stood by its previous ruling, and, consequently, Lyons waived his right to a jury trial and was sentenced to one year on each of Counts 1 through 6, the sentences to run concurrently, and to five years probation on Counts 7 through 12 with the requirement that he participate in a drug treatment program. Lyons appealed to this Court alleging that the trial court erred by excluding his proffered defense. The resolution of this issue, of course, requires examination of Lyons' proffered defense. Hence, we set forth Lyons' proffer in full.

In the beginning of the year 1978, the defendant Robert Lyons (hereinafter Lyons) was living in Bogalusa, Louisiana, employed as a juvenile officer by the City of Bogalusa. He was a college graduate, married, and had three (3) children. He was generally in good health except that he suffered from occasional severe stomach pain, nausea, and vomiting. This condition got worse, and in May of 1978, between May 18 and May 29, he was admitted to the hospital where he was diagnosed as having a probable ulcer. He received narcotic analgesics during this stay in the hospital but ceased using them after his discharge.

On August 21, 1978, through August 26, 1978, Lyons was again hospitalized, this time for surgery on internal hemorrhoids. During this stay in the hospital he was given Percodan and injections of Demerol. Upon being discharged from the hospital he was given a prescription for Percodan which he had filled and took as needed for pain.

In addition to the residual pain from his hemorrhoidectomy, Lyons experienced increased stomach pain, nausea, and vomiting, and was readmitted to the hospital on October 7, 1978, remaining there through October 18, 1978. During this stay in the hospital he received numerous tests and in addition was given substantial quantities of Percodan, Demerol, Mepergan (a combination of Demerol and anti-nausea medicine). He was discharged from the hospital on this occasion with the diagnosis of an ulcer. Among other medicines, he was also given a prescription for Percodan to be taken as needed for pain.

His symptoms grew progressively worse and he had to be readmitted nine days later on October 27, 1978, remaining in the hospital through November 5, 1978. In addition to his other symptoms, the defendant was also running a high fever and while in the hospital he was diagnosed as having a perforated appendix which could not immediately be operated on because of the fear of peritonitis. During this stay in the hospital, the defendant was again given large quantities of Percodan, Demerol, and Mepergan. When he was discharged on November 5, 1978, he again was given a prescription for Percodan to take as needed for pain.

While recuperating at home (and while under the influence of the Percodan which he was taking) he was cleaning a pistol which accidently discharged, wounding him in the left side. He was therefore readmitted to the hospital on November 17, 1978. While the gunshot wound was not particularly serious in and of itself, the defendant was due to have an appendectomy and it was determined to keep him in the hospital for that purpose. He stayed in the hospital between November 17 and November 29, 1978, for the gunshot wound and the appendectomy. During this period he was again given substantial quantities of Percodan, Demerol, and Mepergan. Upon discharge from the hospital on this occasion, the defendant was again given a prescription for Percodan to take as needed for pain.

Around the end of December of 1978, or the beginning of January, 1979, Lyons' treating physician determined not to give him any more Percodan because he was concerned about the possibility of addiction. Up until that time, the defendant had constantly been on Percodan and/or Demerol and/or Mepergan since his hospitalization for hemorrhoids on August 21, 1978. All three of said drugs are highly addictive. Because he continued to suffer substantial stomach pain, Lyons went to another physician, Dr. Glenn Hebert, who advised him that his previous doctor had been wrong to have taken him off of the Percodan and prescribed additional Percodan for Lyons. Dr. Hebert continued to prescribe Percodan for Lyons in constantly increasing amounts during the year 1979.

Lyons became concerned about the difficulty he had functioning when he was not taking Percodan. He inquired of Dr. Hebert if there was any cause for concern. Dr. Hebert assured him that in the course of his medical experience he had had occasion to deal with and treat drug addicts and that Lyons had nothing to be concerned about. On June 15, 1979, Lyons resigned his position with the City of Bogalusa to run for the office of Sheriff for Washington Parish. He was elected to that office in December of 1979.

Around the end of 1979 or the beginning of 1980, Lyons began to develop severe headaches in addition to the stomach pain. Dr. Hebert then prescribed Talwin tablets, another narcotic drug that is highly addictive. The headaches got progressively worse and Lyons underwent surgery in May, 1980, for a deviated septum that was thought to be the possible cause of his headaches. However, following surgery the headaches did not subside and the stomach pain became progressively worse.

In July or August of 1980, Lyons' nausea became so severe that he could no longer take the Talwin tablets orally and had to take it by injections. In late November or early December, 1980 Dr. Hebert began to supply Lyons with Demerol injections. At times Dr. Hebert would simply supply to Lyons the drugs and the syringes used to inject them, and at other times, he would have Lyons go to the local hospital emergency room for injections.

By this time, Lyons' family had discovered that he had a serious drug problem and they had taken measures to try to get him free of drugs. Lyons' wife and his family physician who had previously treated him in 1978 both spoke with Dr. Hebert to warn him about the seriousness of the problem and the possible repercussions. While Dr. Hebert did not cut Lyons off from drugs, he did explain to Lyons that they would have to use more devious means of securing the drugs. Dr. Hebert, in the beginning of October, 1980, put a fake cast on Lyons' leg so that his family and the public would believe he had a broken leg, and therefore a legitimate reason for taking the drugs which Dr. Hebert was supplying. During the middle of October, 1980, Dr. Hebert recommended to Lyons that because he was the sheriff, it would be possible for him to get local doctors to write prescriptions for drugs ostensibly to be used in law enforcement undercover narcotics cases, but in actuality to be used by Lyons to

satisfy his drug needs. And indeed, by this time, Lyons had a tremendous need for drugs, and on the occasions when he could not get them, he suffered great physiological and psychological pain to the extent that he felt a complete inability to refrain from using them.

Accordingly, beginning around the middle of October, 1980, and at various times through the middle of August, 1981, when Lyons was unable to get drugs from Dr. Hebert, he would go to various doctors in the community and secure prescriptions from them under the guise of using the drugs for law enforcement purposes.

In the beginning of 1981 Lyons' family had him hospitalized on two different occasions in an effort to detoxify him, but in both instances he would have deputies bring drugs to him in the hospital. His use of Demerol constantly increased, until finally in August of 1981 he was living almost exclusively for and on Demerol. He was unable to eat any food and consequently had lost over forty (40) pounds and was suffering drastically from malnutrition.

On August 19, 1981, after giving himself a Demerol injection, Lyons had a toxic reaction and went into convulsions. His decalcified bones had become so brittle that during the course of the convulsion, he broke three (3) ribs, three (3) vertebrae, and his left hip was completely torn from the socket.

His family then had him committed to DePaul's Hospital where he remained for three (3) days in excruciating pain because the doctors, not realizing that he had the orthopedic injuries, believed his cries of pain were simply exaggerated efforts to get drugs. After three days he was finally taken to Touro Hospital where x-rays disclosed the extent of his injuries and he was operated on for his hip.

He was returned home to recuperate from his hip surgery before being returned to DePaul Hospital for treatment of his drug addiction. Even while he was home and incapacitated he had his deputies take him to various hospital emergency rooms to get Demerol injections.

However, when news of his addiction became public, the doctors whom he had previously duped, of course ceased to supply him with any more narcotics, and ultimately after thirty-five (35) days in DePaul's Hospital he was finally detoxified and weaned from the drugs. Since that time he has received expert counseling and at the request of his attorney, his physicians require urinalysis and have been able to verify that Lyons remains drug free.

The above facts can be attested to by Lyons and can be corroborated by his wife, friends, employees, his original treating physician, as well as by the hospital and prescription records. These witnesses can not only testify to the particular facts outlined above, but also to the complete change in personality that was exhibited by Lyons during the latter stages of his drug addiction.

In addition to the lay witnesses, the defense would present as expert witnesses, Dr. Doyle Smith, and Dr. C.B. Scrignar. Both of these physicians are recognized as experts in the diagnosis and treatment of drug addiction. Dr. Smith and Dr. Scrignar will testify, in their expert opinion, that at the times of the offense alleged in the indictment, the defendant's drug addiction was a mental disease or defect that caused him to lack the substantial capacity to conform his conduct to the requirements of law. They would explain that drug addiction affects the brain both physiologically as well as psychologically. Recent studies have shown that chronic drug use physically affects the sensors of the brain. This results in a loss of judgment, a markedly increased sensitivity to pain, and a perceived "need" by the brain to be supplied with additional drugs which is very much akin to the brain's need for oxygen.

Because of the drug's affect on the brain, a person in the advanced state of drug addiction does not have any choice

as to whether he takes drugs. Unless and until he becomes completely detoxified, the drug addict's need for more drugs is as compelling as any motivation known to man. Indeed, they would note that the defendant's advanced state of malnutrition and physical deterioration is an example of how the brain requires drugs, even at the expense of life itself.

We now turn to the resolution of the sole issue before this Court.

## II. Lyons' Proffer of Evidence and the Defense of Insanity

■ It is well established that the sanity of the accused is always an element of the offense charged. It is equally well established that the defendant is presumed sane, "and where no evidence to the contrary is presented, that presumption is wholly sufficient to satisfy the required proof that the defendant is sane, and hence responsible for his actions." *United States v. Bass,* 490 F.2d 846, 850 (5th Cir.1974); *Mimms v. United States,* 375 F.2d 135, 140 (5th Cir.1967). However, should the defendant produce even *slight* evidence tending to prove his insanity at the time of the alleged offense, the Government has the burden of proving the defendant's sanity beyond a reasonable doubt. *Blake v. United States,* 407 F.2d 908, 911 (5th Cir.1969) (*en banc*).[1] Whether Lyons' proffer constitutes slight evidence tending to prove his insanity at the times of the alleged offenses in accordance with existing precedent is, therefore, the critical inquiry.

Initially, we note that we do not write on a clean slate. In *Blake,* this Court set forth the applicable standard to be utilized in the Fifth Circuit when a defendant's sanity is put at issue. The Court stated:

A person is not responsible for criminal conduct if, at the time of such conduct, as a result of mental disease or defect, he lacks substantial capacity either to appreciate the wrongfulness of his conduct, *or*

to conform his conduct to the requirements of law.

*Blake,* 407 F.2d at 916 (emphasis added).[2] Additionally, this Court has held that involuntary drug addiction may constitute a "mental disease or defect" bearing on the defendant's criminal responsibility. *United States v. Bass,* 490 F.2d 846 (5th Cir.1974).[3] In *Bass,* a case strikingly similar to the case at bar, this Court concluded that evidence of involuntary drug addiction could, and did in the particular circumstances of that case, constitute relevant evidence on the issue of the defendant's sanity. In *Bass,* as in the instant case, the defendant was charged, *inter alia,* with obtaining narcotics by misrepresentation, deception, fraud, and subterfuge. More importantly, *Bass* and the case *sub judice* both dealt with defendants *involuntarily* addicted to the narcotics they illegally obtained. In *Bass,* the defendant had become involuntarily addicted to Demerol as a result of medical treatment aimed at alleviating the defendant's regional enteritis, an acutely painful disease of the lower gastro-intestinal tract. *Bass,* 490 F.2d at 849.

■ In the instant case, the defendant's proffer indicates that Lyons became involuntarily addicted to pain medication, including Demerol, as a result of medical treatment designed to alleviate the barrage of illnesses suffered by Lyons during the three-year period prior to the commission of the charged offenses. No meaningful distinction between *Bass* and the case *sub judice* can be discerned. In both cases, the defendant embarked upon a course of narcotics use not by choice, but pursuant to doctor's orders—orders presumably aimed at treating an admittedly painful physical disorder. Additionally, in both cases, the defendant offered expert testimony, which, if believed by the jury, would establish that the defendant lacked substantial capacity to conform his conduct to the requirements of applicable law due to his involuntary drug

---

1. Of course, "[t]he question of sufficiency of the evidence necessary to make an issue for the jury on the defense of insanity as well as whether the evidence establishes as a matter of law a reasonable doubt as to a defendant's sanity is for the court." *Blake,* 407 F.2d at 911. However, as noted, once *slight* evidence tending to put the defendant's sanity in issue is presented to the court, the sanity issue must be presented to a properly charged jury.

2. The standard announced in *Blake* is substantially similar to the standard set forth in the

American Law Institute's Penal Code. *See* ALI Model Penal Code § 4.01; *Blake,* 407 F.2d at 913–14.

3. Apparently, neither the prosecution nor the defense was aware of this case during the proceedings below. The panel first brought this case to counsel's attention prior to oral argument. Had counsel made this case available to the district court, this appeal probably would have been unnecessary.

addiction.[4]  Finally, we note that in *Bass,* this Court held that such evidence presented a fact issue for the jury, albeit, a fact issue to be guided and confined by the legal standards set forth in *Blake.*  In light of this precedent, this case must be reversed and remanded so that Lyons' insanity defense may be presented to a jury.

We stress the limited nature of our holding.  We do not hold that Lyons is not to be held responsible for his criminal conduct or that mere allegation of drug addiction is a *per se* defense to a criminal proceeding. Moreover, we have no occasion to determine whether *voluntary* drug addiction constitutes a defense.  Quite simply, we hold that the particular circumstances of this case, in light of this Court's prior holdings in *Blake* and *Bass,* require the district court to allow Lyons to submit his involuntary addiction defense to a jury.

As this opinion indicates, the members of this panel are bound by the legal standards set forth in *Blake* and *Bass.*  Whether these decisions should be altered or changed is not an issue properly before this panel; *en banc* consideration would be necessary to change the legal standards applied by this panel in the case *sub judice.*[5]

For the foregoing reasons, the district court's decision is reversed and the case is remanded for a new trial in accordance with this opinion.

REVERSED AND REMANDED.

## SUGGESTION FOR REHEARING EN BANC

Before CLARK, Chief Judge, BROWN, GEE, RUBIN, GARZA, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY and HIGGINBOTHAM, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc.

IT IS ORDERED that the cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.

---

4. Lyons proffer indicates that two expert witnesses were willing to testify concerning Lyons' involuntary drug addiction.  In fact, Lyons maintained in his proffer that both experts would testify that Lyons' drug addiction "was a mental disease or defect that caused him to lack the substantial capacity to conform his conduct to the requirements of law."  *See* Lyons' Proffer, pages 9–10, *supra.*  Although we recognize that Lyons was allowed to write with a free hand when he prepared his proffer of evidence, it is not possible to conclude that this proffered testimony does not constitute slight evidence placing Lyons' sanity in issue. Indeed, we note that in *Bass,* a case indistinguishable from the instant case, involving evidence strikingly similar to the evidence proffered by Lyons, this Court not only held that the defendants' evidence had created a fact issue for the jury, but remanded the case to the district court and noted that the defendant would be entitled to a directed verdict of acquittal unless the government was able to present sufficient evidence to carry its burden on the issue of the defendants' sanity.  *Bass,* 490 F.2d at 852.  Whether Lyons' proffer accurately presents the facts of Lyons' case is a determination best left to a jury's perceptive consideration.

5. Perhaps the best description of the *Blake* test and the problems attendant thereto was set forth in *Bass.*  The Court stated:

The test which we announced in *Blake* does not require that the mental disease or defect be a permanent one.  The disease or defect may be permanent or temporary as long as the requirements of the test are otherwise met.  When the issue of insanity arises in the trial of a criminal case, the most fundamental fabric of American jurisprudence also goes on trial.  For in that case, the basis of criminal responsibility is examined.  That examination has always involved a difficult accommodation between legal and moral precepts on one hand and medical theory and fact on the other.  Human action rarely admits of simple explanation; where the criminal case presents no issue of insanity, the presumption of sanity and our objective assessment of the facts of the crime "explain" the conduct.  But where the defendant's sanity is before the court, we are required to perform a most difficult task.  To engage in a debate on the permanency or lack of permanency of the mental disease or defect would plunge this branch of the law into the Serbonian Bog of which Cardozo warned us, if we are not already there.

*Bass,* 490 F.2d at 851.