**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Robert LYONS, Defendant-Appellant.**

No. 82–3429.

United States Court of Appeals,
Fifth Circuit.

April 16, 1984.

Julian R. Murray, Jr., New Orleans, La., for defendant-appellant.

John P. Volz, U.S. Atty., Patrick J. Fanning, Harry W. McSherry, Asst. U.S. Attys., New Orleans, La., Sidney Glazer, Atty., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Donald N. Bersoff, Washington, D.C., for American Psychological Assoc., amicus curiae.

Richard P. Lynch, Director, American Bar Ass'n, Washington, D.C., Wallace D. Riley, President, American Bar Ass'n, Chicago, Ill., for American Bar Ass'n, amicus curiae.

Frank Maloney, Austin, Tex., for Nat. Assoc. of Crim. Defense Lawyers, amicus curiae.

Before CLARK, Chief Judge, BROWN, GEE, RUBIN, GARZA, REAVLEY, POLITZ, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY and HIGGINBOTHAM, Circuit Judges [*].

GEE, Circuit Judge:

Defendant Robert Lyons was indicted on twelve counts of knowingly and intentionally securing controlled narcotics by misrepresentation, fraud, deception and subterfuge in violation of 21 U.S.C. § 843(a)(3) (1976) and 18 U.S.C. § 2 (1976). Before trial Lyons informed the Assistant United States Attorney that he intended to rely on a defense of insanity: that he had lacked substantial capacity to conform his conduct to the requirements of the law because of drug addiction. *See* Fed.R.Crim.P. 12.2(a). Lyons proffered evidence [1] that in 1978 he began to suffer from several painful ailments, that various narcotics were prescribed to be taken as needed for his pain, and that he became addicted to these drugs. He also offered to present expert witnesses who would testify that his drug addiction affected his brain both physiologically and psychologically and that as a result he lacked substantial capacity to conform his conduct to the requirements of the law.

In response to the government's motion *in limine*, the district court excluded any evidence of Lyon's drug addiction, apparently on the ground that such an addiction could not constitute a mental disease or defect sufficient to support an insanity defense. A panel of this Court reversed, holding that it was the jury's responsibility

[*] Judges Randall and Davis did not participate in the consideration or decision of this case.

[1] Lyons' proffer of evidence is reproduced in its entirety in the panel opinion. 704 F.2d at 744–47. We merely summarize it here.

to decide whether involuntary drug addiction could constitute a mental disease or defect depriving Lyons of substantial capacity to conform his conduct to the requirements of the law. *United States v. Lyons*, 704 F.2d 743 (5th Cir.1983). We agreed to rehear the case en banc. *Id.* at 748.[2]

I.

For the greater part of two decades our Circuit has followed the rule that a defendant is not to be held criminally responsible for conduct if, at the time of that conduct and as a result of mental disease or defect, he lacked substantial capacity either to appreciate the wrongfulness of his conduct *or to conform his conduct to the requirements of the law. Blake v. United States*, 407 F.2d 908, 916 (5th Cir.1969) (en banc).

■ Today the great weight of legal authority clearly supports the view that evidence of mere narcotics addiction, standing alone and without other physiological or psychological involvement, raises no issue of such a mental defect or disease as can serve as a basis for the insanity defense. *Bailey v. United States*, 386 F.2d 1, 3–4 (5th Cir.1967), *cert. denied*, 392 U.S. 946, 88 S.Ct. 2300, 20 L.Ed.2d 1408 (1968). *Accord, United States v. Coffman*, 567 F.2d 960, 963 (10th Cir.1977); *United States v. Moore*, 486 F.2d 1139, 1181 (D.C.Cir.) (en banc), *cert. denied*, 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973); *United States v. Stevens*, 461 F.2d 317, 321 (7th Cir.1972); *Gaskins v. United States*, 410 F.2d 987, 989 (D.C.Cir.1967); *Green v. United States*, 383 F.2d 199, 201 (D.C.Cir.1967), *cert. denied*, 390 U.S. 961, 88 S.Ct. 1061, 19 L.Ed.2d 1158 (1968); *United States v.*

*Freeman*, 357 F.2d 606, 625 (2d Cir.1966); *Berry v. United States*, 286 F.Supp. 816, 820 (E.D.Pa.1968), *rev'd on other grounds*, 412 F.2d 189 (3d Cir.1969). *Cf. United States v. Romano*, 482 F.2d 1183, 1196 (5th Cir.1973), *cert. denied sub nom. Yassen v. United States*, 414 U.S. 1129, 94 S.Ct. 866, 38 L.Ed.2d 753 (1974) (being involuntarily under the influence of drugs at the time of the crime is not a legal equivalent of insanity). *See also* Fingarette, *Addiction and Criminal Responsibility*, 84 Yale L.J. 413, 424–25 (1975) ("there is no consensus in the medical profession that addiction is a mental disease").[3]

■ There are a number of reasons why. In the first place, there is an element of reasoned choice when an addict knowingly acquires and uses drugs; he could instead have participated in an addiction treatment program. *Moore*, 486 F.2d at 1183 (opinion of Leventhal, J.). A person is not to be excused for offending "simply because he wanted to very, very badly." *Bailey*, 386 F.2d at 4. Second, since the defense of insanity is "essentially an acknowledgement on the part of society that because of mental disease or defect certain classes of wrongdoers are not properly the subjects of criminal punishment," *Freeman*, 357 F.2d at 625, it seems anomalous to immunize narcotics addicts from other criminal sanctions when Congress has decreed severe penalties for mere possession and sale of narcotics. *Id.* In addition, Congress has dealt with the problem of responsibility of narcotics addicts for their crimes by providing for civil commitment and treatment of addicts in lieu of prosecution or sentencing. *Bailey*, 386 F.2d at 4. *See,*

---

**2.** For the en banc hearing we invited interested groups to submit amicus briefs. Several were received, including briefs from the American Bar Association, American Psychological Association, and the National Association of Criminal Defense Lawyers, for all of which we are obliged.

**3.** This rule is consistent with holdings that use of narcotics does not per se render a defendant incompetent to stand trial, *Lewis v. United States*, 542 F.2d 50, 51 (8th Cir.), *cert. denied*, 429 U.S. 837, 97 S.Ct. 105, 50 L.Ed.2d 103

(1976); *United States v. Williams*, 468 F.2d 819, 820 (5th Cir.1972); *Grennett v. United States*, 403 F.2d 928, 931 (D.C.Cir.1968), and that mere alcoholism does not constitute a mental disease or defect warranting an insanity instruction, *Powell v. Texas*, 392 U.S. 514, 535, 88 S.Ct. 2145, 2155, 20 L.Ed.2d 1254 (1968); *United States v. Shuckahosee*, 609 F.2d 1351, 1355 (10th Cir. 1979), *cert. denied*, 445 U.S. 919, 100 S.Ct. 1283, 63 L.Ed.2d 605 (1980); *United States v. Malafronte*, 357 F.2d 629, 632 n. 8 (2d Cir.1966).

*e.g.,* 18 U.S.C. §§ 4251–4255 (1976); 28 U.S.C. §§ 2901–2906 (1976).

█ Finally, what definition of "mental disease or defect" is to be employed by courts enforcing the criminal law is, in the final analysis, a question of legal, moral and policy—not of medical—judgment.[4] Among the most basic purposes of the criminal law is that of preventing a person from injuring others or, perhaps to a lesser degree, himself. This purpose and others appropriate to law enforcement are not necessarily served by an uncritical application of definitions developed with medical considerations of diagnosis and treatment foremost in mind. *Cf. Powell v. Texas,* 392 U.S. at 540–41, 88 S.Ct. at 2158–59 (Black, J., concurring). Indeed, it would be coincidental indeed should concepts deriving from such disparate sources correspond closely, one to the other. Thus it is, for example, that the law has not greatly concerned itself with medical opinion about such mental states as accompany the commission of crimes of passion or of those done while voluntarily intoxicated; whatever that opinion may be, policy considerations have been thought to forbid its cutting much of a figure in court.

Contravening the broad thrust of the authorities cited above, the panel opinion appears to suggest that "involuntary" drug addiction can constitute a "mental disease or defect" bearing on the defendant's criminal responsibility. 704 F.2d at 747. The panel believed itself bound to that rule by such a holding in *United States v. Bass,* 490 F.2d 846 (5th Cir.1974). In so concluding the panel acted with obvious reluctance but with fidelity to the principle that one panel of our court does not overrule another. Today, sitting en banc, we overrule *Bass* insofar as it may be read to hold that *mere* drug addiction, voluntary or involuntary, can be a mental disease for legal purposes. Insofar, however, as it countenanced the receipt of evidence of drug addiction in connection with Bass's genuine mental disease—chronic anxiety—to which it contributed, we find no fault with the opinion.

Although mere narcotics addiction is not itself to be acknowledged as a mental disease or defect, evidence of narcotics addiction has been received by some courts as evidence of such an underlying condition. *Green v. United States,* 383 F.2d 199, 201 (D.C.Cir.1967), *cert. denied,* 390 U.S. 961, 88 S.Ct. 1061, 19 L.Ed.2d 1158 (1968). In addition, if addiction has caused actual physical damage to the structures of a defendant's body, evidence of that addiction has been admitted to show any mental defect resulting from that damage. *Cf. Brinkley v. United States,* 498 F.2d 505, 511–12 (8th Cir.1974) (remanding to explore possible physiological and psychological effects of long term LSD use on appellant and whether these effects might amount to insanity).

We view the reasoning of such rulings as *Green* with profound misgivings. To us it seems to rest on the proposition that, assuming drug addiction itself is neither a mental disease nor a defect, yet the two are often to be found in association, so that an addicted person is more likely to suffer from some mental disorder than is one who

---

4. Speaking of the recent American Psychiatric Association Statement on the Insanity Defense, Professor Phillip E. Johnson notes:

    The APA has not adopted the extreme views of Thomas Szasz, but it has definitely repudiated the ideology of Karl Menninger. The psychiatrists no longer want the criminal law to change to conform to deterministic psychiatric concepts; instead, they regard it as vital to the integrity of their own discipline that "legal or moral constructs such as free will" be understood as outside the domain of psychiatry. They emphatically affirm that most people, including those with sociopathic personality disorders, should be held accountable for what they do. They are not washing their hands of the legal problems, and they believe that the law still needs them, but they understand that legal and moral decisions are ultimately to be made by citizens, not experts. I regard this newly found modesty as evidence of the profession's increasing maturity, not as a sign of its failure.

    Johnson, Book Review, 50 U.Chi.L.Rev. 1534, 1548 (1983) (reviewing N. Morris, Madness and the Criminal Law (1982)).

is not addicted.[5]  By a parity of reasoning, since combat veterans as a group are self-evidently more likely to have suffered the loss of a physical member than is the populace at large, evidence of whether a party is a combat veteran should be received on the issue whether he has lost a leg.  Or, to take a less extreme example, since because of light skin pigmentation persons of Scandinavian ancestry are more subject to skin cancer than are others, the family tree of a suitor should be received in evidence when his skin cancer is at legal issue.  The flaw in both illustrations seems evident: where evidence bearing directly on a legal question is available, that involving tangential matters, even though perhaps logically relevant in theory, is of small practical value.[6]

Our review of numerous records over the course of years has revealed no dearth of experts ready and willing to testify squarely on the issue of insanity in criminal trials: direct evidence on the issue seems all but too readily available.  Since this is so, receiving evidence of drug addiction in addition seems to us an exercise seldom likely to prove more probative than prejudicial in practice.  See Rule 403, Federal Rules of Evidence.[7]

Nor do we see how matters are clarified by reference to the condition of addiction as one involving "psychological damage" to the addict, e.g., Brinkley v. United States, supra.  As nearly as we can determine, the psychological condition so described is simply one of drug addiction to one degree or another, a condition that we have already declined to view as a mental disease or defect for legal purposes.  An actual drug-induced or drug-aggravated psychosis, or physical damage to the brain or nervous system would, however, be another matter.

We do not doubt that actual physical damage to the brain itself falls within the ambit of "mental disease or defect."  To refuse to recognize that a congenital microcephalic, or one who has suffered, say, extensive brain damage from a gunshot wound or other physical trauma, may be thereby rendered unable to appreciate the character of his conduct as wrongful would be presumptuous.  Here, within the limits of appropriate legal and policy considerations, the medical model must have its day.  The same is true of the question whether such organic brain pathology or psychosis can be caused by drugs.

■  Lyons asserted by his proffer of evidence that his drug addiction caused physiological damage to his brain and that this damage caused him to lack substantial capacity to conform his conduct to the requirements of the law.  704 F.2d at 746.  Since he did so, he should—under our subsisting Blake test—have been allowed to introduce evidence of any physical brain damage and consequent mental disease or defect.  Because the proffer offers evidence tending to suggest such damage, that evidence should have been submitted to the jury.  Blake, 407 F.2d at 911.  And although we today withdraw our recognition of the volitional prong of Blake—that as to which such evidence has usually been advanced—we also conclude that should Lyons wish to offer such evidence in an attempt to satisfy the remaining cognitive prong, fairness demands that we afford him an opportunity to do so.

## II.

■■  Because the concept of criminal responsibility in the federal courts is a congeries of judicially-made rules of decision based on common law concepts, it is usual-

5.  See, e.g., Gerard & Kornetsky, *Adolescent Opiate Addiction: A Study of Control and Addict Subjects*, 29 Psychiatric Q. 457 (1955); Sutker, *Personality Differences and Sociopathy in Heroin Addicts and Nonaddict Prisoners*, 78 J. Abnormal Psychology, 247 (1971).

6.  Indeed, it may be counter-productive.  One might well view with suspicion a claim to have lost a leg made by one who supported it only

with evidence that he had served in combat, rather than by lifting his trouser cuff.

7.  We do not suggest that references in testimony to drug use as the cause of or as aggravating particular brain pathology should be viewed as taboo, only that attempts to characterize addiction as itself a mental disease or defect are not to be countenanced.

ly appropriate for us to reexamine and reappraise these rules in the light of new policy considerations. *Wion v. United States*, 325 F.2d 420, 425 (10th Cir.1963). We last examined the insanity defense in *Blake v. United States*, 407 F.2d 908 (5th Cir.1969) (en banc), where we adopted the ALI Model Penal Code definition of insanity: that a person is not responsible for criminal conduct if, at the time of such conduct and as a result of mental disease or defect, he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. *Id.* at 916. Following the example of sister circuits, we embraced this standard in lieu of our former one, defined in *Howard v. United States*, 232 F.2d 274, 275 (5th Cir.1956) (en banc),[8] because we concluded that then current knowledge in the field of behavioral science supported such a result. 407 F.2d at 909, 914–15. Unfortunately, it now appears our conclusion was premature—that the brave new world that we foresaw has not arrived.

Reexamining the *Blake* standard today, we conclude that the volitional prong of the insanity defense—a lack of capacity to conform one's conduct to the requirements of the law—does not comport with current medical and scientific knowledge, which has retreated from its earlier, sanguine ex-

pectations. Consequently, we now hold that a person is not responsible for criminal conduct on the grounds of insanity only if at the time of that conduct, as a result of a mental disease or defect, he is unable to appreciate the wrongfulness of that conduct.[9]

We do so for several reasons. First, as we have mentioned, a majority of psychiatrists now believe that they do not possess sufficient accurate scientific bases for measuring a person's capacity for self-control or for calibrating the impairment of that capacity. Bonnie, *The Moral Basis of the Insanity Defense*, 69 ABA J. 194, 196 (1983).[10] "The line between an irresistible impulse and an impulse not resisted is probably no sharper than between twilight and dusk." *American Psychiatric Association Statement on the Insanity Defense*, 11 (1982) [APA Statement]. Indeed, Professor Bonnie states:

> There is, in short, no objective basis for distinguishing between offenders who were undeterrable and those who were merely undeterred, between the impulse that was irresistible and the impulse not resisted, or between substantial impairment of capacity and some lesser impairment.

Bonnie, *supra*, at 196.[11]

---

**8.** The *Howard* standard provided that insanity constituted either the "incapacity from some mental disease or defect to distinguish between right and wrong with respect to the act, or the inability from such disease or defect to refrain from doing wrong in the commission of the act." 232 F.2d at 275.

**9.** We employ the phrase "is unable" in preference to our earlier formulation "lacks substantial capacity" for reasons well stated in the Commentary of the American Bar Association Standing Committee:

> Finally, it should be pointed out that the standard employs the term "unable" in lieu of the "substantial capacity" language of the ALI test. This approach has been taken both to simplify the formulation and to reduce the risk that juries will interpret the test too loosely. By using the "substantial capacity" language, the drafters of the ALI standard were trying to avoid the rigidity implicit in the M'Naughten formulation. They correctly recognize that it is rarely possible to say that a

mentally disordered person was totally unable to "know" what he was doing or to "know" that it was wrong; even a psychotic person typically retains some grasp of reality. However, the phrase "substantial capacity" is not essential to take into account these clinical realities. Sufficient flexibility is provided by the term "appreciate."

Commentary (revised November, 1983) to Standards 7–6.1(a) and 7–6.9(b), ABA Standing Committee on Association Standards for Criminal Justice (to be published).

**10.** *See also* H. Fingarette, *The Meaning of Insanity* 166 (1972); Wootton, *Book Review*, 77 Yale L.J. 1019, 1026–27 (1968); Statement of David Robinson, Jr., *The Insanity Defense*, Hearings Before the Senate Comm. on the Judiciary, 97th Cong., 2d Sess. 72–73 (1982); Testimony of Stephen Morse, *Insanity Defense in Federal Courts*, Hearings Before the Subcomm. on Criminal Justice of the House Comm. on the Judiciary, 97th Cong., 2d Sess. 211 (1982).

**11.** One commentator has noted that no one has ever observed the process of a person losing the

In addition, the risks of fabrication and "moral mistakes" in administering the insanity defense are greatest "when the experts and the jury are asked to speculate whether the defendant had the capacity to 'control' himself or whether he could have 'resisted' the criminal impulse." Bonnie, *supra*, at 196. Moreover, psychiatric testimony about volition is more likely to produce confusion for jurors than is psychiatric testimony concerning a defendant's appreciation of the wrongfulness of his act. APA Statement at 12. It appears, moreover, that there is considerable overlap between a psychotic person's inability to understand and his ability to control his behavior. Most psychotic persons who fail a volitional test would also fail a cognitive test, thus rendering the volitional test superfluous for them. *Id.*[12] Finally, Supreme Court authority requires that such proof be made by the federal prosecutor beyond a reasonable doubt, an all but impossible task in view of the present murky state of medical knowledge. *Davis v. United States*, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895).[13]

One need not disbelieve in the existence of Angels in order to conclude that the present state of our knowledge regarding them is not such as to support confident conclusions about how many can dance on the head of a pin.[14] In like vein, it may be that some day tools will be discovered with which reliable conclusions about human volition can be fashioned. It appears to be all but a certainty, however, that despite earlier hopes they do not lie in our hands today. When and if they do, it will be time to consider again to what degree the law should adopt the sort of conclusions that they produce. But until then, we see no prudent course for the law to follow but to treat all criminal impulses—including those not resisted—as resistible. To do otherwise in the present state of medical knowledge would be to cast the insanity defense adrift upon a sea of unfounded scientific speculation, with the palm awarded case by case to the most convincing advocate of that which is presently unknown—and may remain so, because unknowable.

### III.

Thus, Lyons' claim that he lacked substantial capacity to conform his conduct to the requirements of the law will not raise the insanity defense. It would be unfair, however, to remit him retroactively

capacity for self-control, and "that no one can." Fingarette, *supra*, at 160.

12. *See also* Statement of Stephen Morse, *Insanity Defense in Federal Courts*, Hearings Before the Subcomm. on Criminal Justice of the House Comm. on the Judiciary, 97th Cong., 2d Sess. 231 (1982).

13. John Hinckley is the young man who attempted to assassinate President Reagan in order to attract attention to himself and to impress a movie actress whom he admired from a distance. The subsequent proceedings called into question not only the insanity defense but the rationality of our adversarial jury-trial system. After more than a year of expensive pretrial maneuvering and psychiatric examinations, the lawyers jousted for eight weeks of trial, examining and cross-examining expert witnesses who naturally gave conflicting and confusing testimony on whether Hinckley's obviously warped mentality amounted to legal insanity. The judge instructed the jury to return a verdict of not guilty unless they could agree "beyond a reasonable doubt" that Hinckley was sane. If taken literally, the instruction amounted to a directed verdict of not guilty, considering the deadlock of expert opinion and the difficulty of certifying the sanity of a young man who shot the President to impress a movie star. Juries usually ignore such unpopular legal standards, but the *Hinckley* jury surprised everybody by taking the law seriously and finding him not guilty. Hinckley will now be confined to a mental hospital indefinitely because he is "dangerous," although there is no reliable way to predict what he would do if released and no reliable test to determine if he has been "cured."
Johnson, Book Review, 50 U.Chi.L.Rev. 1534, 1536 (1983) (reviewing N. Morris, Madness and the Criminal Law (1982)).

14. "What Song the Syrens sang, or what name Achilles assumed when he hid himself among women, though puzzling questions, are not beyond all conjecture." Sir Thomas Browne, URN BURIAL, v.

to our newly restricted insanity defense without allowing him the opportunity to plan a defense bearing its contours in mind. Consequently, we vacate his conviction and remand for a new trial in accordance with our new insanity standard. As for other cases, today's holding shall have prospective application only, commencing thirty days from the date of its publication.

VACATED and REMANDED.

ALVIN B. RUBIN and JERRE S. WILLIAMS, Circuit Judges, with whom POLITZ, TATE, and HIGGINBOTHAM, Circuit Judges, join, concurring in part and dissenting in part:

The sole issue raised by the appellant, Lyons, and by the appellee, the United States, is whether iatrogenic narcotics addiction alone may constitute a mental disease or defect sufficient to support the defense of insanity in a criminal prosecution. The court ranges far beyond this narrow issue. It uses this case as a vehicle to reconsider and to redefine the scope of the insanity defense, although such a reconsideration and redefinition was not asked for in the district court or in this court by either of the parties. We are constrained to dissent from this serious misadventure in the judicial process.

We agree with the conclusion the court reaches in Part I of its opinion that drug addiction alone is insufficient to support an insanity defense. We reach that conclusion, however, through a different route, which does not require the overruling of *United States v. Bass,* 490 F.2d 846 (5th Cir.1974).

A review of the precedents in this circuit concerning narcotics addiction and the insanity defense must begin with *Bailey v. United States,* 386 F.2d 1 (5th Cir.1967), *cert. denied,* 392 U.S. 946, 88 S.Ct. 2300, 20 L.Ed.2d 1408 (1968). In *Bailey,* the defendants were charged with various crimes relating to the purchase and possession of narcotics. As in Lyons' case, their theory was that addiction is itself a disease or

defect that creates a compulsion to procure and to use narcotics, and that one acting under such a compulsion should not be held criminally responsible. *Id.* at 3. Their proffer consisted of their testimony that they were "addicted to narcotics, had been unable to cure [their] addiction, and could not resist the daily use of the [narcotics]." 386 F.2d at 3. At that time this Circuit was still applying the earlier insanity rule, as articulated by the Supreme Court in *Davis v. United States,* 165 U.S. 373, 378, 17 S.Ct. 360, 362, 41 L.Ed. 750 (1897), derived from *M'Naghten's Case,* 8 Eng.Rep. 718 (1843). That test, in essence, exculpates a defendant who, because of mental disability, is incapable of distinguishing between right and wrong, or is unable to control his conduct. *See Blake v. United States,* 407 F.2d 908, 913 (5th Cir.1969) (en banc). While the *Bailey* defendants urged us to adopt the American Law Institute's Model Penal Code standard, we held that the case was not "a proper vehicle for reexamination of [the appropriate insanity standard] for the reason that the issue of criminal responsibility was not raised by the evidence." 386 F.2d at 3.

Our opinion in *Bailey* recognized that, according to the weight of authority, "a mere showing of narcotics addiction, without more, does not constitute 'some evidence' of mental disease or insanity so as to raise the issue of criminal responsibility." *Id.* at 4 (quoting *Heard v. United States,* 348 F.2d 43, 44 (D.C.Cir.1965)). Moreover, we expressed doubt that addiction to narcotics actually deprived the addict of the ability to obey the law: "It would appear that an element of reasoned choice yet exists when an addict knowingly violates the law in acquiring and using drugs. One is not excused for offending simply because he wanted to very, very badly." 386 F.2d at 4. Finally, we noted in *Bailey* that Congress had passed laws designed to assist the criminal offender addicted to narcotics. The Narcotic Addict Rehabilitation Act of 1966,[1] provides for civil commitments of addicts or for sen-

---

1. 28 U.S.C. §§ 2901–2906, 18 U.S.C. §§ 4251–    4255.

tences requiring treatment. Because Congress had thus acted specifically to define the proper treatment of narcotics addicts convicted of crime, we were reluctant in *Bailey* to fashion a different remedy through the insanity defense. *Bailey*, therefore, stands for the proposition that narcotics addiction alone is insufficient evidence of a mental disease or defect to raise the issue of criminal responsibility. *Cf. Doughty v. Beto*, 396 F.2d 128, 130 (5th Cir.1968) (evidence of alcoholism, without more, does not create constitutional defense for one convicted of theft).

The majority opinion suggests that *Bailey* may have been limited or overruled by our later decisions in *Blake v. United States*, 407 F.2d 908 (5th Cir.1969) (en banc), and *United States v. Bass*, 490 F.2d 846 (5th Cir.1974). The members of the panel that initially heard this case shared that view, thought the interpretation undesirable, and suggested en banc review to modify or to clarify the holdings of *Blake* and *Bass*. We need not here discuss the exact reach of those two decisions because, sitting en banc, we are not bound by them. Whatever might be their scope as applied to other contentions, however, neither *Blake* nor *Bass* is inconsistent with the *Bailey* court's conclusion that *addiction alone* is not enough to raise the insanity defense. And that is the sole issue pressed before us: that evidence of iatrogenic addiction suffices to require presentation of the issue of criminal responsibility to a jury.

In *Blake* we adopted the Model Penal Code definition of the insanity defense. We did not, of course, discuss whether proof of narcotics addiction of itself would suffice under our newly adopted test. But *Blake* did not qualify *Bailey*. In *Bailey* we had expressly refused to consider adopting the Model Penal Code standard, not because we disapproved of it in any way, but because we concluded that under any test narcotics addiction alone was insufficient to constitute insanity and to negate criminal responsibility. 386 F.2d at 3.

Moreover, in *United States v. Tsoi Kwan Sang*, 416 F.2d 306 (5th Cir.1969), decided after *Blake*, we reaffirmed our holding in *Bailey*. We held that the defendant had produced evidence sufficient to warrant submitting the issue of insanity to the jury. We stated specifically that "the opinion of the court ... did not conflict with [*Bailey* because] ... the evidence of insanity [went] well beyond mere addiction." *Id.* at 310 (on petition for rehearing and rehearing en banc).

*United States v. Bass, supra*, overruled at least in part by the majority opinion, did not involve a claim of an insanity defense based upon narcotics addiction alone. The defendant suffered from an acutely painful and incurable disease. Around the time of the indictment, Bass had suffered several fevers that, in the opinion of one doctor, had inflicted temporary brain damage. Bass suffered from "chronic anxiety," and had discussed suicide. We held that he had made an initial showing of insanity sufficient to shift the burden of proof to the government. But we did not rest our holding on narcotics addiction *alone*. Indeed, we did not even rely primarily on narcotics addiction:

> Both treating doctors testified that Bass' *chronic anxiety*, which was caused by an awareness that his disease was incurable and that he would forever be dependent on Demerol for relief from pain, constituted a 'mental disease or defect' as required by the *Blake* test.

*Id.* at 850 (emphasis added). Our holding in *Bass*, therefore, is not inconsistent with *Bailey*. As in *Tsoi Kwan Sang*, the evidence of insanity went "well beyond mere addiction."

These cases establish a relatively clear standard. *Bailey* holds that narcotic addiction alone is insufficient to raise the insanity defense. *Tsoi Kwan Sang* and *Bass* make it clear that addiction, when accompanied by evidence of mental disease or defect, may suffice for an initial showing of insanity.

It thus is well-established in this Circuit, as well as elsewhere, that narcotics addic-

tion alone does not constitute a mental disease or defect for purposes of the insanity defense. If this were not already clearly the law of the circuit, we would join in an unequivocal clarification en banc. But that would not alter the result as to Lyons. The contention he presents is that iatrogenic addiction stands on a different footing from voluntary addiction. Our opinion in *Bass* did not rely on the involuntariness of the defendant's addiction. Because the extent of the mental incapacity represented by narcotics addiction is exactly the same whether voluntarily or involuntarily induced, we see no reason to create a distinction on that basis. As we said in *Bailey*, "[i]t would appear that an element of reasoned choice yet exists when an addict knowingly violates the law in acquiring and using drugs." 386 F.2d at 4.

We do not, therefore, dissent from the basic conclusion reached by the majority in Part I of its opinion that evidence of narcotics addiction standing alone is not sufficient to warrant a trial court's submitting an insanity defense to the jury. Nor, had the argument been made on appeal that the proffer's purpose was to show the existence of a mental disease or defect, to be evaluated under the *Bass* standard, would we dissent from a reversal for the purpose of receiving that evidence. But these statements establish the grounds for our dissent: Having decided the question that disposes of this case, the majority undertakes to examine an issue neither raised in the trial court, tendered by the parties on appeal, nor suggested by the panel.

This case simply does not require redefinition of the insanity defense. The proffer did submit that Lyons' drug usage might have affected his brain "both physiologically as well as psychologically," and this, conceivably, might be read to suggest the existence of a disease or defect. But Lyons did not make this contention on appeal, and the government did not choose to focus its reply to Lyons' appeal on the impropriety of the existing standard; it chose instead to argue that he had failed to offer evidence sufficient to meet that standard.[2] The government's position was surely correct. Lyons' proffer did no more than state the undisputed conclusion that drug consumption has an impact on the brain's physiology. Were the presence of some effects on the central nervous system dispositive, then every addict would be able to establish an insanity defense. *Cf.* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, (*DSM* III) 163 (3d ed. 1980) (individuals who have substance use disorder will, at times, manifest direct acute or chronic effects of substances on the central nervous system). The majority's affirmation of the rule that addiction alone does not invoke the insanity defense therefore disposes of Lyons' appeal.

The majority's strained reading of the record and caselaw hardly justifies its self-appointed mission of redefining the insanity defense. That mission is as unwise as it is unnecessary. As the government's lawyer observed during oral argument to the en banc court, this is an inappropriate case and an inopportune time for such an exercise.

There is now substantial ferment concerning the insanity defense. See the summary in Dutile & Singer, What Now for the Insanity Defense?, 58 Notre Dame L.Rev. 1104 (1983). Congress is evaluating proposals for change as it considers comprehensive legislation to revise the United States Criminal Code. *See, e.g.,* 41 Cong. Quarterly 633 (1983) (administration proposals). The American Bar Association House of Delegates, at its meeting in February 1983, established an official American Bar Association policy recommending a change in the standards and burden of proof with respect to the insanity defense.

---

**2.** The government initially confined its arguments to those described above. Once the court's questions and solicitation of amici briefs indicated which way the wind was blowing, however, the government of course reset its sails accordingly and filed a second supplemental brief advocating abolition of the volitional prong. It is also suggesting legislation to accomplish that end. *See* text, post. Given a way to achieve its objective, it will tread either path.

69 A.B.A.J. 426 (1983). A further change in American Bar Association policy is anticipated to be on the House of Delegates agenda at the annual meeting of the Association in August 1984. This proposal would revise or define the words "mental disease or defect". Part II of the opinion for the Court adequately demonstrates additional controversy as to possible modifications of the insanity defense. Considering all of these circumstances, including the possibility of Congressional action, the court's eagerness to depart from the standards that have been adopted in every federal court over almost two decades [3] is especially inappropriate.

When the evidence in a case squarely raises a question concerning the continued applicability of the volitional test to the definition of insanity, it will be our duty to consider that issue. But the policies embodied in the prerequisites to the insanity defense are too fundamental and too critical to be resolved in the abstract. Considering it sua sponte en banc, the majority demonstrates a complete lack of appropriate judicial self-restraint. Concurring in Part I of the opinion, we would affirm the result reached by the district court. We dissent from all of the obiter dicta that constitutes the rest of the opinion.

Because the majority opinion does redefine the standards that determine criminal responsibility, Judge Rubin will hereafter file a dissent from the adoption of a test that would permit the criminal law to be used to punish persons who lack any ability to conform their conduct to the law, and would thus by judicial redefinition convert our criminal legal system into one of punishment without fault.

3. See *United States v. Currens*, 290 F.2d 751 (3d Cir.1961); *Wion v. United States*, 325 F.2d 420 (10th Cir.1963), *cert. denied*, 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309 (1964); *United States v. Shapiro*, 383 F.2d 680 (7th Cir.1967) (en banc); *United States v. Chandler*, 393 F.2d 920 (4th Cir.1968) (en banc); *United States v. Smith*, 404 F.2d 720 (6th Cir.1968); *Blake v. United States*, 407 F.2d 908 (5th Cir.1969) (en banc); *Wade v. United States*, 426 F.2d 64 (9th Cir.

JOHNSON, Circuit Judge, dissenting.

This dissent is necessitated by the mischaracterization of the panel opinion by both the majority and the dissenting opinion of Judges Rubin and Williams; by the mischaracterization of Lyons' contentions on appeal by both opinions; and because of the sincere belief that the Court is here choosing a particularly inopportune time to delve into the quagmire of the insanity defense.

The issue on appeal in the Lyons case was quite clear; it was not whether Lyons was indeed insane. The issue was simply whether Lyons should have been permitted to submit his insanity argument and defense to the jury. The jury, of course, was fully entitled to reject or accept his contentions. The panel concluded that Lyons should have been permitted to submit his argument and defense to the jury under existing precedent and I continue to believe that the existing precedent of this circuit requires such a result.

It is noted at the outset that Lyons' proffer goes far beyond a mere allegation of iatrogenic drug addiction. The majority's and Judge Rubin's and Judge Williams' characterization of Lyons' contentions as alleging *mere* drug addiction is, in my judgment, inaccurate. An examination of Lyons' proffer demonstrates that Lyons' addiction became so extreme that he lost over forty pounds and suffered from drastic malnutrition. The proffer notes that "[h]is decalcified bones had become so brittle that during the course of [a] convulsion, he broke three [3] ribs, three [3] vertebrae, and his left hip was completely torn from the socket." Moreover, Lyons offered to present two expert witnesses, indeed medical witnesses, that would testify that

1970) (en banc); *United States v. Frazier*, 458 F.2d 911 (8th Cir.1972); *United States v. Brawner*, 471 F.2d 969 (D.C.Cir.1972) (en banc); *United States v. Figueroa*, 666 F.2d 1375 (11th Cir. 1982) (following *Blake v. United States*). Although the First Circuit has not explicitly taken a position, that court has suggested its approval of the ALI test. See *Beltran v. United States*, 302 F.2d 48, 52 (1st Cir.1962) (citing *United States v. Currens, supra*).

Lyons' addiction had damaged his brain, both physiologically and psychologically.[1]

When Lyons' proffer is viewed in its true form, it becomes clear that he was entitled to submit his insanity defense to the jury under existing precedent.[2] The reasons for this conclusion were set forth in the panel opinion:

[T]his Court has held that involuntary drug addiction may constitute a "mental disease or defect" bearing on the defendant's criminal responsibility. *United States v. Bass*, 490 F.2d 846 (5th Cir. 1974). In *Bass*, a case strikingly similar to the case at bar, this Court concluded that evidence of involuntary drug addiction could, and did in the particular circumstances of that case, constitute relevant evidence on the issue of the defendant's sanity. In *Bass*, as in the instant case, the defendant was charged, *inter alia*, with obtaining narcotics by misrepresentation, deception, fraud, and subterfuge. More importantly, *Bass* and the case *sub judice* both dealt with defendants *involuntarily* addicted to the narcotics they illegally obtained. In *Bass*, the defendant had become involuntarily addicted to Demerol as a result of medical treatment aimed at alleviating the defendant's regional enteritis, an acutely painful disease of the lower gastro-intestinal tract. *Bass*, 490 F.2d at 849.

In the instant case, the defendant's proffer indicates that Lyons became involuntarily addicted to pain medication, including Demerol, as a result of medical treatment designed to alleviate the barrage of illnesses suffered by Lyons during the three-year period prior to the commission of the charged offenses. No meaningful distinction between *Bass* and the case *sub judice* can be discerned.[3] In both cases, the defendant embarked upon a course of narcotics use not by choice, but pursuant to doctor's orders—orders presumably aimed at treating an admittedly painful physical disorder. Additionally, in both cases, the defendant offered expert testimony, which, if believed by the jury, would establish that the defendant lacked substantial capacity to conform his conduct to the requirements of applicable law due to his involuntary drug addition.

*United States v. Lyons*, 704 F.2d 743, 747 (5th Cir.1983). For these reasons, the reasons which are more fully explained in the panel opinion, it is my belief that Lyons should be permitted to present his insanity defense to the jury under the law of this Circuit.

Having explained why Lyons should have been permitted to submit his case to the jury under the existing precedent of this Circuit, I pause to note my agreement with many of the concerns stated by Judge

---

1. Judges Rubin and Williams concede that Lyons' proffer alleging physiological and psychological brain damage could "conceivably" be read to suggest the existence of a disease or defect. It is submitted that is precisely what the proffer states.

2. It should be remembered that the law of this Circuit requires a defendant only to produce *slight* evidence of insanity to put the defendant's mental condition at issue. *See, Blake v. United States*, 407 F.2d 908, 911 (5th Cir.1969) (*en banc*). The en banc Court stated in *Blake:* "It follows that if there is some evidence supporting the claim of insanity ... the issue must be submitted to the jury. [citations omitted] This means only slight evidence." *Id.*

3. It is suggested that Judges Rubin's and Williams' attempt to distinguish *Bass* from this case is unpersuasive. Attempting to glean distinguishing factors in *Bass,* Judges Rubin's and

Williams' dissent states: "The defendant suffered from an acutely painful and incurable disease. Around the time of the indictment, Bass had suffered several fevers that, in the opinion of one doctor, had inflicted temporary brain damage." In the instant case, Lyons' proffer demonstrates that during the period of his iatrogenic addiction he suffered from and was treated for the following painful disorders: (1) stomach ulcer; (2) internal hemorrhoids; (3) perforated appendix; (4) gunshot wound; and (5) deviated septum. Additionally, Lyons' proffer indicates that he suffered high fevers. Lyons alleged that these facts could be attested to by his wife, employees, his original treating physician, as well as by the hospital and prescription records. Certainly this, in conjunction with the expert testimony indicating brain damage, constitutes slight evidence of a mental disease or defect. Lyons should have been permitted to submit his case to a properly charged jury.

Gee concerning the existing insanity defense. Even though the present insanity test may be too broad, even though the abolition of the volitional prong might more properly limit the insanity inquiry, and even though this Court's action might align the insanity defense of this Circuit with the current views of the psychiatric school of thought, the timing of this action seems particularly inappropriate. In light of the very real possibility of congressional action on this issue and in view of the undisputed preference for the will of the public to be expressed by that body, it seems particularly inappropriate for this Court to take this action by *en banc* intervention at this time.